**2024 IL 129353**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 129353)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
JOHNNY FLOURNOY, Appellant.

*Opinion filed August 22, 2024.*

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

## OPINION

¶ 1   Following a September 1994 jury trial, petitioner, Johnny Flournoy, was sentenced to life imprisonment after a jury found him guilty of first degree murder and armed robbery for the 1991 killing of Samuel Harlib and robbery of a used car dealership.

¶ 2 In February 2021, years after numerous unsuccessful appeals and an initial postconviction petition, petitioner filed a motion for leave to file a successive postconviction petition, pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). In his proposed successive postconviction petition, petitioner alleged newly discovered evidence showed (1) his actual innocence, (2) that the State concealed and fabricated evidence, violating his right to due process, (3) that the State knowingly used material, perjured testimony in violation of his right to due process, and (4) that he received ineffective assistance of trial counsel. In support of his successive postconviction petition, he attached numerous documents, including affidavits.

¶ 3 The Cook County circuit court denied petitioner leave to file his successive postconviction petition, finding the attached affidavits did not constitute newly discovered evidence and, even if the evidence could be considered newly discovered, it did not raise the probability that the result would be different on retrial. Ultimately, the court found petitioner's proposed successive petition and his supporting evidence failed to make the showing required to advance his claims.

¶ 4 The appellate court affirmed, relying on this court's decision in *People v. Hobley*, 182 Ill. 2d 404 (1998). See 2022 IL App (1st) 210587-U, ¶¶ 29-33. The court stated, "In *People v. Hobley*, our supreme court held that a postconviction petitioner cannot raise a 'free-standing' claim of actual innocence based on newly discovered evidence that is being used to supplement an assertion of a constitutional violation with respect to the trial." *Id.* ¶ 29 (citing *Hobley*, 182 Ill. 2d at 443-44). The court went on to address the merits of petitioner's actual innocence claim using the affidavits but found petitioner failed to present a colorable claim of actual innocence because the evidence was not so conclusive it probably would change the result on retrial. *Id.* ¶¶ 39, 46. The court then held that petitioner was procedurally barred from arguing that one of the affidavits supported an independent claim of a constitutional violation. *Id.* ¶ 52. However, the court went on to find petitioner's remaining constitutional claims failed where he could not demonstrate cause and prejudice at the leave-to-file stage. *Id.* ¶¶ 57, 59, 62, 67-68. For the following reasons, we affirm.

¶ 5                                    I. BACKGROUND

¶ 6                     A. Circuit Court Proceedings and Direct Appeal

¶ 7        In April 1992, petitioner was charged in a 13-count indictment alleging he committed various offenses, including 3 counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, ¶ 9-1(a)(1), (2), (3)), attempt (first degree murder) (*id.* ¶ 8-4), and armed robbery (*id.* ¶ 18-2(a)). The charges stemmed from a November 14, 1991, armed robbery of a used car dealership, which resulted in the shooting death of Samuel Harlib.

¶ 8                               1. *Petitioner's Jury Trial*

¶ 9        In September 1994, petitioner's case proceeded to a jury trial. We summarize the relevant testimony elicited during trial.

¶ 10       On November 14, 1991, Raphael Mendoza and Harlib were working at Ron/Mar Auto Sales, a used car dealership located at 3845 N. Western Avenue in Chicago, Illinois. Mendoza testified that, shortly after 5:30 p.m., both he and Harlib were in the sales office when he noticed a man looking at a vehicle in the lot. Mendoza went outside and spoke with the man, whom Mendoza later identified as petitioner. Mendoza testified, when he spoke with petitioner, he was looking at his face and was about two or three feet from petitioner. After speaking with petitioner about a down payment on a vehicle, Mendoza notified Harlib that petitioner wanted to buy a vehicle. Mendoza testified that the vehicle needed a jump start, so after he told Harlib that petitioner wanted to buy the vehicle, Mendoza went to jump-start the vehicle, and Harlib went to speak with petitioner. After Mendoza jump-started the vehicle, Harlib told him he locked the keys in the vehicle, so Mendoza went to get a tool to unlock the vehicle while Harlib and petitioner walked into the dealership.

¶ 11       Mendoza testified that, after he unlocked the vehicle, he went to join Harlib and petitioner in the dealership office. When Mendoza walked into the office, petitioner was standing inside holding a gun, and he ordered Mendoza to sit down. Petitioner then alternated between pointing the gun at Mendoza and Harlib. Mendoza testified Harlib "jumped for the gun" and the gun went off, firing into the floor. Petitioner

then pointed the gun at Harlib and shot him twice. Mendoza then observed petitioner grab two stacks of money on the desk before he fired shots in Mendoza's direction, which did not hit Mendoza, and fled the scene. Mendoza called 911, and an ambulance took Harlib to the hospital, where he died.

¶ 12    In December 1991, Mendoza viewed a physical lineup of potential suspects, which did not include petitioner. Mendoza did not identify any of the individuals in the lineup as the person who shot Harlib. Mendoza however told police he recognized one person in the lineup, a man named Reginald Smith. Mendoza testified that Smith had previously purchased a vehicle from the dealership and that he occasionally came into the dealership to make his payments, but Mendoza confirmed to detectives that Smith was not the person who shot Harlib. In March 1992, Mendoza viewed another physical lineup and immediately identified petitioner in the lineup as the person who shot Harlib.

¶ 13    Chicago police detective Lawrence Akin was assigned to investigate Harlib's death. Detective Akin testified that, during the investigation, he spoke with a woman named Elizabeth Barrier,[1] who provided information about a man named Reginald Smith. Detective Akin discovered Smith was in Cook County jail and brought him in for questioning. Around that time, Detective Akin also learned of a man named Ramano Ricks.[2] In December 1991, police put both Smith and Ricks in a physical lineup for Mendoza to view. Detective Akin testified that Mendoza recognized Smith as an acquaintance of Harlib and that Smith had purchased a vehicle from Harlib but Smith was not the person who shot Harlib. Detective Akin testified that after the lineup he did not question Ricks regarding the incident or tell Ricks what the investigation was about. Detective Akin gave Ricks his business card and told him to contact him if he heard anything unusual or out of the ordinary.

---

[1] The record on appeal acknowledges Elizabeth Barrier in her affidavit attached to the successive postconviction petition refers to herself as Elizabeth Foster. She states Barrier was her maiden name. For purposes of consistency and to avoid confusion, we will refer to her as Elizabeth Barrier throughout our opinion.

[2] Petitioner spelled Ricks's first name "Romano" in his appellate brief, but in the affidavit from Ricks, which is attached to petitioner's successive postconviction petition, Ricks spells his first name "Ramano." Because "Ramano" is the name used more prominently in the record, we use "Ramano" when using Ricks's first name.

¶ 14 Two months later, in February 1992, Ricks contacted Detective Akin from Cook County jail. Detective Akin went to the jail and spoke with Ricks, who implicated petitioner as the person who shot Harlib. Detective Akin acknowledged he had more than one conversation with Ricks and was present when Ricks made a March 1992 written statement that Ricks had a conversation with Smith about information regarding Harlib's murder that implicated petitioner. Detective Akin testified Ricks never told him that petitioner admitted to Ricks that he shot Harlib.

¶ 15 In March 1992, police arrested petitioner and placed him in a physical lineup for Mendoza to view. Detective Akin stated that, as soon as he opened the curtain, Mendoza immediately started shouting "That's him. That's him. That's the last guy. The last guy on the right is him" as he identified petitioner as the person who shot Harlib.

¶ 16 Ramano Ricks testified that in October 1991 he was living in Detroit, Michigan, where he met petitioner. At that time, petitioner loaned Ricks $500 because he said he needed some money. A month later, in November 1991, Ricks went with friends to Chicago for petitioner's wedding. Ricks testified they did not make it in time for the wedding but he saw petitioner at the Chicago Days Inn hotel and at a bar. Petitioner asked Ricks if he had the money he loaned him. Ricks testified he told petitioner he did not have the money, to which petitioner responded that Ricks could commit an armed robbery to get the money. Petitioner showed Ricks that he was carrying a gun, and petitioner told Ricks he did not have a choice but to commit a robbery to get the money. Ricks testified that petitioner then gave him advice on how to commit armed robbery.

¶ 17 Later, petitioner came over to the Days Inn hotel where Ricks and others were staying and mentioned to Ricks that he had recently shot a man while robbing a car dealership. Petitioner explained to Ricks that he and Smith went to the car dealership, where petitioner pretended to be interested in buying a car and spoke to an employee. Then, petitioner went inside with the employee, where they went into a small room, and that is when petitioner pulled out a gun and forced the employee to take money out of the safe. However, the employee reached for the gun, and petitioner shot him. When petitioner turned around, there was a "Puerto Rican or Mexican guy looking dead at him," but he ran away.

¶ 18        Ricks and Smith went forward with committing an armed robbery of a Jewel grocery store that same day and were subsequently arrested. Ricks and Smith were in custody for the robbery when they were placed in the December 1991 lineup that Mendoza viewed.

¶ 19        Ricks testified that a few months after the lineup he contacted Detective Akin because he wanted to be put into protective custody after another inmate tried to stab him. Ricks believed petitioner tried to have him killed. Ricks testified that he then provided a March 1992 written statement where he stated that, following the December 1991 lineup, he had a conversation with Smith about information regarding Harlib's murder that implicated petitioner as the shooter. Ricks provided grand jury testimony attesting that both Smith and petitioner said petitioner committed the armed robbery and shot Harlib. Ricks testified that he pleaded guilty to robbing the grocery store, he received a 10-year sentence, and prosecutors did not promise him a reduced sentence to testify against petitioner. Ricks also testified he did not have an ax to grind with petitioner but rather he wanted justice to be done.

¶ 20        On cross-examination, petitioner's counsel impeached Ricks by stating he had spoken to Ricks several times and Ricks had said "I don't know nothing and I don't remember nothing" about Harlib's murder. Ricks admitted he told petitioner's counsel that but explained he had not wanted to talk to petitioner's counsel because counsel tried to get him to swear that he would not come to court on petitioner.

¶ 21        To corroborate Ricks's testimony that petitioner discussed the armed robbery of the car dealership and Harlib's murder with Ricks, a police officer testified that police arrested Ricks and Smith in November 1991, when they attempted to rob a grocery store. During the arrest, police searched a car used in the robbery and discovered a receipt from the Chicago Days Inn hotel. Upon a further search, police also recovered paperwork belonging to petitioner in a room at the hotel.

¶ 22        Petitioner presented alibi testimony from his wife, his stepdaughters, and his boss. The alibi witnesses testified that they knew petitioner's whereabouts on the day of the murder and he could not have been the perpetrator. One of petitioner's stepdaughters testified she was with him at the time of the murder but that they did not go to a car dealership. The State presented impeachment evidence that called into question the veracity of the alibi evidence, including prior statements from the

- 6 -

alibi witnesses made to police that they did not know petitioner's whereabouts at the exact time of the murder.

¶ 23     The jury found petitioner guilty of first degree murder and armed robbery but acquitted him of the attempted murder of Mendoza. The state sought the death penalty, but the jury unanimously rejected a death sentence.

¶ 24                    2. *Petitioner's Posttrial Motion and Sentence*

¶ 25     In October 1994, petitioner filed a *pro se* posttrial motion, alleging that (1) Ricks's entire testimony was false and a fabrication pursuant to a deal struck with the State and (2) trial counsel was ineffective for failing to call Elizabeth Barrier and Smith to testify.

¶ 26     Petitioner alleged that before trial Ricks made several telephone calls to petitioner, where Ricks told petitioner that his statements to police implicating petitioner in the shooting of Harlib were false and only offered to recant those statements if petitioner paid his legal fees to his attorney. Petitioner stated the telephone conversations happened with both his wife and friend Nate Neal listening on the phone. Petitioner also attested that he spoke to Ricks's lawyer before trial and that the lawyer said that Ricks had told police that petitioner shot Harlib "because [Ricks] allegedly believed [petitioner] was trying to have him beat up at the jail." Petitioner alleged that he reported all of this to his attorney and that he paid Ricks's attorney $2000 in 1992 but the money was returned in 1993, "after no effort had been made to get a sworn affidavit from Ricks recanting and him telling the truth."

¶ 27     Petitioner further alleged his counsel made no timely effort to secure tape from his July 1992 parole revocation hearing, which would have impeached Detective Akin, Mendoza, and Ricks, as well as demonstrated the prosecutor was part of a perjury prosecution.

¶ 28     Petitioner also alleged his defense counsel was ineffective for failing to call Barrier to testify, when the information she provided in a police report initiated the case against petitioner and counsel was successful in locating Barrier and she was willing to testify on his behalf.

¶ 29 Subsequently, the court held a hearing on petitioner's posttrial motion where the court specifically asked petitioner's counsel if he spoke with Barrier. Petitioner's counsel stated,

> "Yes, I did Judge. Miss Barrier who I located as a witness who previously lived on the north side of the city had moved down to Florida. I had located her through her parents and spoken to her and she was willing to come in and testify that she had a conversation with Reginald Smith who was also here and able to testify. And that Reginald Smith basically, you know, came to her on one evening and said you know a friend of mine has just been killed, was very upset. He had some cash on him, drugs, new clothes, and essentially the conversation was that Reginald Smith had been there just a few minutes beforehand and the implication was, she never came out right and said it although she did say on the phone yeah, I know who killed him, it was Reginald Smith. Although Reginald Smith never came out directly and said that, that was her assumption.

> She was down in Florida. She was up for that week. She was ready, willing[,] and able to testify for the purposes of in my mind impeaching Reginald Smith, should Reginald Smith be brought to the stand and he testified to something different than we would have him testify to. The problem is that as the court remembers, Reginald Smith gave a statement which had he taken the stand he would have been subject to impeachment and in that statement contains many things which would have been quite damning for Mr. Flo[u]rnoy."

¶ 30 The court responded, "You chose not to call her." In response, counsel stated, "That is correct." Subsequently, the court denied petitioner's posttrial motion.

¶ 31 After the State moved to have petitioner adjudicated a habitual criminal and presented certified copies of two of his previous armed robbery convictions, the circuit court sentenced him to life imprisonment as a habitual criminal.

¶ 32                                  3. *Direct Appeal*

¶ 33 On direct appeal, petitioner argued (1) his conviction should be reversed because the evidence was insufficient to convict him beyond a reasonable doubt

and (2) the circuit court committed reversible error by allowing Ricks to testify to petitioner's admissions regarding the crimes and by failing to give the jury a limiting instruction. Specifically, petitioner asserted Ricks's testimony should not be believed. The appellate court affirmed the circuit court's judgment on direct appeal. *People v. Flournoy*, 284 Ill. App. 3d 1118 (1996) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 34                     B. Initial Postconviction Proceedings

¶ 35        In January 1997, petitioner filed a *pro se* postconviction petition, alleging (1) the State used perjured testimony of Ricks and Detective Akin regarding Ricks's statements and what Ricks was promised and/or given in return for his testimony against him at trial, (2) the State suppressed evidence favorable to the defense, and (3) he received ineffective assistance from his appellate counsel, who failed to raise these issues on direct appeal. Petitioner also argued his trial counsel was ineffective for several reasons, including that counsel failed to (1) obtain a parole revocation hearing tape, which could have been used to impeach Ricks and Detective Akin, and (2) produce two witnesses, Barrier and Smith. Petitioner alleged his counsel had spoken to Barrier before trial, she knew who committed the crime, and she was available to testify at trial that petitioner did not commit the crime.

¶ 36        In support of his petition, petitioner attached numerous documents, including an unofficial transcript from his parole revocation hearing and his affidavit. In his affidavit, petitioner stated that Ricks had offered before trial to "clear" petitioner of Harlib's murder if petitioner paid Ricks's lawyer, and petitioner attested that his wife and Neal were parties to those telephone conversations.

¶ 37        The circuit court dismissed the postconviction petition at the first stage, and the appellate court affirmed on appeal. *People v. Flournoy*, 306 Ill. App. 3d 1173 (1999) (table) (unpublished order under Illinois Supreme Court Rule 23). The appellate court held that petitioner "made his claims of perjury and suppression of evidence repeatedly to the circuit court and on direct appeal" and could not raise them again in a postconviction petition. *Flournoy*, slip op. at 7. The court further found, as a matter of trial strategy, trial counsel could reasonably decline to call Smith and Barrier as witnesses. *Id.* at 11-12. Moreover, the court stated petitioner

"did not attach the affidavits of the witnesses to the post-conviction petition" and that, "[w]ithout these affidavits, this court cannot determine whether Elizabeth Barrier and Reginald Smith could have provided any information or testimony favorable to [petitioner]." *Id.* at 10.

¶ 38                         C. Motion for Leave to File a Successive
                                    Postconviction Petition

¶ 39        In February 2021, petitioner filed a motion for leave to file a successive postconviction petition. In his proposed successive postconviction petition, petitioner alleged (1) the attached affidavits of Ricks and Barrier constitute newly discovered evidence of actual innocence, (2) Ricks's affidavit constitutes newly discovered evidence that the State fabricated inculpatory evidence against petitioner and concealed exculpatory or impeachment evidence, violating his right to due process, (3) Ricks's affidavit constitutes newly discovered evidence that the State knowingly used material, perjured testimony in violation of his right to due process, and (4) Barrier's affidavit constitutes newly discovered evidence that petitioner was denied his constitutional right to effective assistance of trial counsel.

¶ 40        In support of his successive postconviction petition, petitioner attached numerous documents, including Ricks's March 1992 written statement to police where he stated that Smith told him petitioner shot Harlib and that police did not offer him anything for his statement. Petitioner attached Ricks's March 1992 grand jury testimony where he testified that (1) Smith told him he had been involved in an armed robbery where he remained in the car while petitioner shot an employee of a car dealership and (2) petitioner separately told Ricks that he had shot someone in an armed robbery at a car dealership.

¶ 41        Petitioner also attached a transcript of a July 1992 parole revocation hearing, which was held after his arrest in this case, as he was on parole at the time from another conviction. Petitioner claims the prosecutor at trial helped conceal the true motives behind Ricks's trial testimony where the prosecutor was present at the revocation hearing that took place prior to trial. At the revocation hearing, Detective Akin testified that Ricks contacted him about the shooting at the car dealership. When asked if Ricks sought anything in exchange for giving information, Detective Akin testified, "He just asked if we could help him with the armed robbery case."

Detective Akin stated, "We haven't given him anything so far." Petitioner argues that, although the prosecutor attended the revocation hearing, the prosecutor did not impeach Ricks's perjured trial testimony where Ricks stated at trial that he did not seek any favorable result for testifying.

¶ 42    Petitioner also attached redacted 1992 police reports. Petitioner provides that, per the reports, a friend of Barrier contacted police and said that Barrier had told him that (1) Smith came to her apartment shortly after Harlib's murder to do drugs, (2) Smith was upset because his friend "Sam" had been killed during a robbery at Sam's car dealership, and (3) Smith told Barrier he had been at the dealership shortly before the shooting but he was not there when the murder occurred. Petitioner contends that the reports also show that police talked to Barrier and she told the police the same story that Smith was upset because his good friend Sam had been killed but he was not at the dealership when the murder occurred.

¶ 43    Petitioner further attached 2018 signed affidavits from Ricks and Barrier. In his affidavit, Ricks claimed that, after he appeared in the December 1991 physical lineup, Detective Akin informed him about a murder at a used car lot on the north side of Chicago that occurred during an armed robbery and indicated Smith was involved. Ricks asserted that, after Detective Akin described how the shooting occurred, Ricks "truthfully told him that I did not know anything about the shooting." Ricks claimed that, while he was in jail for the armed robbery of the Jewel, he believed that either petitioner or Smith was trying to have him killed, so he contacted Detective Akin to discuss Harlib's murder. Ricks admitted that he told Detective Akin that Smith set up the robbery and petitioner carried it out. Ricks further admitted that he told Detective Akin that Smith had informed him that petitioner confessed to Smith that he committed the murder right after the armed robbery occurred at the car dealership. Ricks acknowledged he gave a written statement summarizing what he told Detective Akin.

¶ 44    Ricks, however, claimed that the statements he gave detectives "are false." Specifically, Ricks claimed that Smith "never made any statements to me to indicate that [petitioner] was involved in the robbery and murder." Ricks asserted that he only gave that statement to police because he was angry at petitioner because he believed petitioner was behind the attacks against him in jail. Ricks claimed that he specifically asked Detective Akin if he could help him on his pending armed

robbery case and that Detective Akin told him "he could not 'officially' help me, but that he would see what he could do to get me a lesser sentence. He also told me that he would help me get into a work release program."

¶ 45     Ricks also asserted that Detective Akin told him "they could not bring a case against [petitioner] unless I testified that [petitioner] told me about being involved in the murder." Thus, Ricks claimed he fabricated the story that petitioner told him that he and Smith committed a robbery and that petitioner shot someone during the robbery. Specifically, Ricks stated, "I made up the story because I was mad at [petitioner] and because I wanted help on my pending armed robbery case." Ricks also claimed his grand jury testimony and trial testimony were false. Lastly, Ricks stated that, to the best of his knowledge, he served approximately 2½ years of his 10-year sentence before he was allowed work release.

¶ 46     In Barrier's affidavit, she claimed that she met Smith at an inpatient rehab program in Chicago. Barrier stated that, in late 1991, Smith showed up at her apartment one night with cocaine and heroin. Smith told her that he had robbed a used car dealership and that he had shot the car dealer in front of his safe. Barrier kicked Smith out of her apartment because she was terrified of what he told her, and then she contacted her friend John and told him what Smith had told her, and she believed John then informed the police.

¶ 47     Barrier claimed that, to the best of her memory, when she spoke with police about the shooting, she "refused to answer their questions." Barrier stated she had relapsed and feared Smith. Barrier further stated that the police report reflecting what she told police about what Smith told her was not consistent with her memory because of the amount of time that had passed, and she remembered "refusing to tell the police anything about what [Smith] said to" her. However, Barrier claimed, if the report accurately reflects what she told police, she did not tell the full truth because Smith "specifically told [her] that he shot the car dealer he had robbed." Barrier asserted that, sometime after she spoke with police, she relapsed and drove to Florida to live as a "vagrant."

¶ 48     Barrier also claimed that petitioner's trial counsel's statements that he had spoken to her on the phone were false and that she was never contacted by anyone in connection with this case about being a witness at trial. Barrier asserted that her

parents did not know where she was in Florida because she did not have a home and she also did not have a phone. Thus, petitioner's counsel's statements are false.

¶ 49 The circuit court denied petitioner leave to file his successive postconviction petition, finding Ricks's and Barrier's affidavits did not constitute newly discovered evidence and, even if the evidence could be considered newly discovered, it did not raise the probability that the result would be different on retrial. Ultimately, the court found petitioner's proposed successive petition and his supporting evidence failed to make the showing required to advance his claims.

¶ 50 Petitioner appealed the denial of his motion for leave to file a successive postconviction petition, arguing that (1) the affidavits from Ricks and Barrier constitute newly discovered evidence that supports a colorable claim of actual innocence, (2) he made a substantial showing that the State violated his due process rights by failing to correct inaccurate testimony by Ricks during the trial, and (3) he made a substantial showing that he received ineffective assistance of counsel at trial based on counsel's failure to investigate or call Barrier as a trial witness. 2022 IL App (1st) 210587-U, ¶ 25.

¶ 51 The appellate court affirmed the circuit court's denial of petitioner's motion for leave to file a successive postconviction petition. *Id.* ¶ 70. Before reaching the merits of the appeal, the court determined it "must address the contention that [petitioner] cannot raise his claim of actual innocence because it is based on the same evidence [petitioner used] to support his claims of violations of his constitutional rights." *Id.* ¶ 29. Relying on our decision in *Hobley*, 182 Ill. 2d 404, the court stated, "In *People v. Hobley*, our supreme court held that a postconviction petitioner cannot raise a 'free-standing' claim of actual innocence based on newly discovered evidence that is being used to supplement an assertion of a constitutional violation with respect to the trial." 2022 IL App (1st) 210587-U, ¶ 29. The court further stated,

"We will return to this matter at the appropriate moment in our disposition. Suffice now to say that given the vociferation of [petitioner's] actual innocence argument compared with the argument the State knowingly used perjured testimony, specifically when it allowed Ricks, unchallenged, to testify [petitioner] admitted shooting the victim to Ricks, we will consider

- 13 -

[petitioner's] evidence of Ricks'[s] recantation of that testimony as it pertains to his claim he is actually innocent." *Id.* ¶ 33.

The court went on to address the merits of petitioner's actual innocence claim using the affidavits from Ricks and Barrier but found petitioner failed to present a colorable claim of actual innocence because the evidence was not so conclusive it would probably lead to a different result on retrial. *Id.* ¶¶ 39, 46.

¶ 52　　　The appellate court then addressed petitioner's argument that the State violated his due process rights by knowingly relying on perjured testimony from Ricks and Detective Akin that Ricks did not ask for consideration in exchange for his cooperation. *Id.* ¶ 48. The court found that petitioner was procedurally barred from arguing that Ricks's affidavit, which included his recantation, supports an independent claim of a constitutional violation based on the State knowingly using perjured testimony. *Id.* ¶ 52. The court also found that petitioner's claim that the State knowingly used perjured testimony when Ricks testified petitioner admitted shooting the victim fails to demonstrate prejudice to petitioner. *Id.* ¶ 53.

¶ 53　　　The appellate court next addressed petitioner's claim that the State concealed evidence that Ricks obtained work release in exchange for his testimony, finding petitioner failed to make a *prima facie* showing that this information was not already known to him and therefore could not establish cause to raise the claim in a successive petition. *Id.* ¶¶ 54-62.

¶ 54　　　Last, the appellate court rejected petitioner's argument that trial counsel was ineffective for failing to investigate or call Barrier as a witness. *Id.* ¶¶ 64-67. The court found that trial counsel's decision was a matter of trial strategy and was not unreasonable. *Id.* ¶ 67. Therefore, the court found that petitioner failed to make a *prima facie* showing to establish his ineffective assistance claim and the circuit court did not err in denying petitioner leave to file his successive petition. *Id.*

¶ 55　　　This court granted petitioner's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 56                                    II. ANALYSIS

¶ 57        In this appeal, petitioner argues that (1) he can support both his postconviction claim of actual innocence and his postconviction claims of constitutional trial error with the affidavits of Ricks and Barrier, (2) his successive postconviction petition stated a colorable claim of actual innocence based on the newly discovered affidavits of Ricks and Barrier, (3) his petition made a *prima facie* showing that the State violated his due process rights by concealing evidence that Ricks testified in exchange for a promise of leniency on his armed robbery case and that Ricks lied about petitioner's alleged admissions to Harlib's murder in exchange for this promise, and (4) his petition made a *prima facie* showing that he was denied effective assistance of trial counsel based on Barrier's affidavit, where she stated that trial counsel failed to interview her, even though she could have provided exculpatory evidence, and misrepresented to the circuit court that he had contacted and spoken with her.

¶ 58                            A. Petitioner's Postconviction Claims and
                                          Supporting Evidence

¶ 59        In this matter, the primary question before us is whether a petitioner seeking leave to file a successive postconviction petition can plead a claim of actual innocence and use the same evidence to plead a claim of constitutional trial error. To settle the question before us, we begin by reviewing the relevant case law.

¶ 60        In *People v. Washington*, 171 Ill. 2d 475 (1996), this court recognized the viability of a freestanding claim of actual innocence in postconviction proceedings. *Id.* at 489 (stating "there is footing in the Illinois Constitution for asserting freestanding innocence claims based upon newly discovered evidence under the Post-Conviction Hearing Act"). Specifically, this court stated, "[t]he claim Washington raised is a 'free-standing' claim of innocence; unlike the ineffective-assistance claim supported by Martin's testimony, the newly discovered evidence is not being used to supplement an assertion of a constitutional violation with respect to his trial." *Id.* at 479. To establish a freestanding claim of actual innocence, this court determined that the evidence in support of the postconviction claim must be new, material, noncumulative, and of such conclusive character that it would probably change the result on retrial. *Id.* at 489.

¶ 61    Two years later, in reviewing *Washington*, this court in *Hobley* determined "[a] 'free-standing' claim of innocence means that the newly discovered evidence being relied upon 'is not being used to supplement an assertion of a constitutional violation with respect to [the] trial.' " *Hobley*, 182 Ill. 2d at 443-44 (citing *Washington*, 171 Ill. 2d at 479). Accordingly, this court found a "free-standing" actual innocence claim exists when the newly discovered evidence relied on thereafter is not also used to supplement a constitutional trial error claim. *Id.* at 444. Thus, because this court already determined that the State's actions regarding certain evidence were sufficient to proceed with a third-stage evidentiary hearing on the defendant's constitutional trial error claim, the same evidence did not support a "free-standing" actual innocence claim under *Washington*. *Id.*

¶ 62    In *People v. Orange*, 195 Ill. 2d 437, 459 (2001), we reaffirmed our holding in *Hobley*. Pointedly, *Orange* recognized that "*Hobley* distinguished this court's earlier decision in *Washington* by noting that the evidence in *Washington* was not being used to supplement an assertion of a constitutional violation at trial." *Id.* This court found "*Hobley* to be on point," where the defendant in *Orange* failed "to present a free-standing claim of actual innocence under *Washington*." *Id.* at 460. Rather, the court found the evidence was being "used to supplement [the defendant's] claim that his confession was coerced and involuntary. Accordingly, the defendant was not entitled to an evidentiary hearing on his claim of actual innocence." *Id.*

¶ 63    Years later, this court in *Coleman* reiterated its unwavering commitment to its holding in *Washington*. *People v. Coleman*, 2013 IL 113307, ¶ 93. Explicitly, the court recognized that, in *Washington*, it declined to follow federal case law and instead determined a "free-standing" claim of actual innocence in postconviction proceedings was cognizable under the Illinois Constitution. *Id.* ¶¶ 83-84 (citing *Washington*, 171 Ill. 2d at 488-89). The *Coleman* court then went on to state that "*Washington* provides the appropriate standard for ultimate relief." *Id.* ¶ 93. Definitively, the court stated that

    "[i]n Illinois, a postconviction actual-innocence claim is just that—a postconviction actual-innocence claim. Where a defendant makes a claim of trial error, as well as a claim of actual innocence, in a successive postconviction

petition, the former claim must meet the cause-and-prejudice standard, and the latter claim must meet the *Washington* standard." *Id.* ¶ 91.

¶ 64    Since *Hobley* and *Coleman*, our appellate court has disagreed on this issue. The appellate court in this case found petitioner cannot use the same allegedly newly discovered evidence to raise an actual innocence claim and claims of violations of his constitutional rights. 2022 IL App (1st) 210587-U, ¶¶ 29-33, 52. However, the appellate court in *People v. Martinez*, 2021 IL App (1st) 190490, ¶ 102, found *Hobley* "attempted to track *Washington*'s application of the law, but in doing so, deviated from both the spirit and the letter of the law as set forth in *Washington*." Specifically, the court asserted,

"*Hobley* identified no principle or purpose that would be furthered by prohibiting a defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim. Furthermore, the *Hobley* rule would potentially force a defendant to choose to forgo a meritorious claim of trial error in order to pursue an actual innocence claim." *Id.*

¶ 65    The appellate court in *Martinez* also found *Hobley* to be inconsistent with *Coleman*. Specifically, the court asserted that "*Coleman*'s explanation of a freestanding actual innocence claim contemplates that the *claims* be independent, not that the actual innocence claim be independent of *the evidence* underlying his other constitutional claim or trial error." (Emphases added.) *Id.* ¶ 104. The court noted the standard necessary to establish a claim of actual innocence—that the evidence be (1) new, (2) material, (3) noncumulative, and (4) so conclusive that it would probably change the result on retrial—however, the court found "*Hobley* effectively imposes a fifth requirement: that the evidence underlying the actual innocence claim not be used to support any other constitutional claim." *Id.* ¶ 105.

¶ 66    Ultimately, the *Martinez* court determined on the facts before it that, even if *Hobley*'s rule remains good law, it did not preclude the defendant's actual innocence claim where it was based on "evidence in addition to" that underlying his constitutional claims of trial error. *Id.*

¶ 67    In reviewing the case law, we find *Hobley* and *Orange* remain good law and are consistent with *Coleman* and *Washington*. Both *Hobley* and *Orange* revealed

that evidence that establishes a "free-standing" claim of actual innocence will not establish a claim of constitutional trial error. Then in *Coleman*, this court reaffirmed *Washington* and the relevant standards needed to establish a "free-standing" claim of actual innocence and a claim of constitutional trial error in a successive postconviction petition. Specifically, this court determined that, where a petitioner makes a claim of constitutional trial error in a successive postconviction petition, he must meet the cause-and-prejudice standard and, where a petitioner makes a "free-standing" actual innocence claim, he must meet the *Washington* standard.

¶ 68        We find a petitioner can use the same evidence to plead both a "free-standing" claim of actual innocence and a claim of constitutional trial error. While a petitioner can plead a "free-standing" claim of actual innocence and a claim of constitutional trial error using the same evidence, our precedent is clear that, in the end, if the evidence establishes a claim of constitutional trial error, it will not establish a "free-standing" claim of actual innocence.

¶ 69        A deep dive into the facts of *Washington* is instructive. In *Washington*, 171 Ill. 2d at 476-78, the defendant filed an amended postconviction petition that included a claim that his trial counsel was ineffective for failing to investigate evidence that someone other than the defendant committed the murder, as well as a claim of actual innocence. Both claims were supported by the same evidence, specifically, testimony from a witness, Jacqueline Martin, who stated that two other men had committed the murder. *Id.* at 477-78. Martin also testified that she had been hiding in a location out of state at the time of the defendant's trial and that she had not come forward sooner and identified the real killers because she feared for her safety. *Id.* at 478. The circuit court denied the defendant's claim of ineffective assistance of counsel based on Martin's testimony but granted relief on his claim of actual innocence. *Id.* at 478. The appellate court affirmed the circuit court's ruling. *Id.* at 479.

¶ 70        On appeal in this court, the question presented was whether the defendant's "free-standing" claim of actual innocence was cognizable under the Act. *Id*. at 479-80. We note that in *Washington*, if the proceedings were viewed solely in terms of the knowledge and evidence available to the parties at the time of trial, then no constitutional trial error occurred. See *id.* at 498 (McMorrow, J., specially concurring). Martin's whereabouts were unknown at the time of the defendant's

trial, and trial counsel could not be held ineffective for failing to find her. See *id.* Nor, for the same reason, could the State be faulted for failing to produce her testimony at trial. See *id.* Thus, as this court noted, the " 'adjudicatory process' " by which the defendant was convicted did not "lack due process." *Id*. at 487 (majority opinion).

¶ 71        Washington demonstrates that a "free-standing" claim of actual innocence is fundamentally *different* from any possible claims of constitutional trial error. *Id.*

¶ 72        Claims of trial error would necessarily rest on the assumption that Martin's testimony was available to the parties at the time of trial and that either the defendant's trial counsel or the State had a constitutional obligation to produce that testimony. The actual innocence claim, in contrast, rested on the *opposite* assumption, *i.e.*, that Martin's testimony was new evidence that was unavailable to the parties when the defendant was being tried. The actual innocence claim was thus a "free-standing" claim that was not being used to assert that a constitutional violation occurred at the time of trial. *Id*. at 479.

¶ 73        The actual innocence claim recognized in *Washington* was based on "new" evidence, *i.e.*, evidence that either did not exist or could not have been discovered at the time of trial. Indeed, it was only because Martin's testimony was *unavailable* at the time of trial and could not support a claim of constitutional trial error that this court had to consider whether there was another basis on which relief could be granted. This is the reason why decisions from this court have stated that the same evidence may not be used to support both a "free-standing" claim of actual innocence and a claim of constitutional trial error. See *Hobley*, 182 Ill. 2d at 443-44; *Orange*, 195 Ill. 2d at 460. If the evidence is "new" within the meaning of *Washington* then, by definition, it did not exist or could not have been discovered at the time of trial and, therefore, cannot support a claim of trial error. Conversely, if the evidence is not "new" within the meaning of *Washington*, then again, by definition, it can only support a claim of constitutional trial error. Stated otherwise, if certain evidence establishes a "free-standing" claim of actual innocence, that same evidence cannot also establish a claim of constitutional trial error because evidence cannot be both "new" and "not new" at the same time. Accordingly, to the extent that appellate court decisions such as *Martinez*, 2021 IL App (1st) 190490, suggest that the same evidence may establish both a "free-standing" claim

of actual innocence and a claim of constitutional trial error, those decisions are in error and are overruled.

¶ 74 Having answered the question of whether a petitioner seeking leave to file a successive postconviction petition can plead a "free-standing" claim of actual innocence and use the same evidence to plead a claim of constitutional trial error, we turn to petitioner's claims. Ultimately, we agree with the circuit court's decision and explain why below.

¶ 75 B. Actual Innocence Claim

¶ 76 Petitioner argues his successive postconviction petition states a colorable claim of actual innocence based on the newly discovered affidavits of Ricks and Barrier.

¶ 77 A motion for leave to file a successive postconviction petition raising a claim of actual innocence should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence. *Robinson*, 2020 IL 123849, ¶ 44. "[L]eave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Id.* At the leave-to-file stage of successive proceedings, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Id.* ¶ 45. This court has consistently held, and we recently reaffirmed in *People v. Griffin*, 2024 IL 128587, ¶ 40, that at the leave-to-file stage, the circuit "court is precluded from making factual and credibility determinations." *Robinson*, 2020 IL 123849, ¶ 45.

¶ 78 "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Id.* ¶ 47. In this case, we find petitioner cannot set forth a colorable claim of actual innocence because his supporting affidavits are not new.

¶ 79 "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due

diligence." *Id.* Petitioner argues that through no amount of due diligence could he have discovered the evidence in either Barrier's or Ricks's affidavits sooner. We disagree.

¶ 80                                                    1. *Barrier's Affidavit*

¶ 81        We first address whether the evidence in Barrier's affidavit was available at the time of trial. In Barrier's affidavit, she swore that her friend Smith confessed to shooting Harlib and, contrary to his representations, petitioner's trial counsel never contacted her to testify at trial.

¶ 82        Petitioner contends he could not have discovered the evidence in Barrier's affidavit until after trial because his trial counsel was his only resource to find Barrier prior to trial and counsel made false representations to the court about having spoken to Barrier and deciding not to call her as a witness. Specifically, petitioner argues that the evidence in Barrier's affidavit could not be discovered earlier with any amount of due diligence because in her affidavit Barrier swore, contrary to trial counsel's representations at petitioner's posttrial hearing, that trial counsel never contacted her to testify and she was unavailable where she moved to Florida and lived as a vagrant. Until he received Barrier's affidavit, petitioner asserts he had no reason to know that his counsel had not spoken to Barrier.

¶ 83        The record in this case shows that Barrier was known to the parties before trial, she had information about the shooting at the car dealership, and she was available at some point before trial. Police reports appended to petitioner's successive postconviction petition make clear that Barrier was known to police and spoke with police early in the investigation about the shooting at the car dealership. Detective Akin also testified at trial that, during the investigation into the car dealership shooting, he spoke with Barrier, who provided information about Smith.

¶ 84        Further, the record shows that petitioner argued in numerous prior proceedings that Barrier's testimony was known to the defense before trial and she was available to testify. However, petitioner's trial counsel stated at the hearing on petitioner's posttrial motion that he decided not to call Barrier to testify because the main point of her testimony was to impeach Smith and that Smith was not being called to testify because his testimony "would have been quite damning" for petitioner.

¶ 85 Even taking Barrier's affidavit as true that petitioner's counsel never spoke with her about testifying in petitioner's case, the evidence in Barrier's affidavit about her knowledge of the shooting at the car dealership was discoverable prior to trial. While Barrier did not testify at trial, petitioner's argument that no amount of due diligence could have discovered the evidence in Barrier's affidavit sooner is not persuasive based on the record. Accordingly, we find the information in Barrier's affidavit is not new.

¶ 86                              2. *Ricks's Affidavit*

¶ 87 We next address whether the evidence in Ricks's affidavit was available at the time of trial. In Ricks's affidavit, he recants his trial testimony that petitioner shot Harlib and admits to being offered leniency in his armed robbery case in exchange for his testimony against petitioner.

¶ 88 Petitioner argues that through no amount of due diligence could he have discovered Ricks's recantation evidence sooner because Ricks did not recant his testimony and admit to being offered consideration for it until he did so in his affidavit.

¶ 89 We find the evidence in Ricks's affidavit was discoverable at the time of trial. The record shows that petitioner, in his *pro se* posttrial motion and initial postconviction petition, alleged in an affidavit that he spoke with Ricks numerous times on the telephone before trial and that Ricks told petitioner that his statements to police implicating petitioner in the shooting were false and that he offered to recant those statements if petitioner paid his legal fees. Petitioner attested that his telephone conversations with Ricks occurred with both his wife and Neal listening on the phone. Petitioner also attested that he met with Ricks's lawyer before trial, who told him that Ricks told police that petitioner shot Harlib because Ricks "allegedly believed [petitioner] was trying to have him beat up at the jail."

¶ 90 Based on petitioner's own statements, Ricks's recantation testimony was available prior to trial, and petitioner could have called his wife, Neal, and Ricks's lawyer to testify that Ricks recanted before trial. Accordingly, petitioner failed to exercise due diligence where the evidence could have been discovered earlier. Thus, we find the recantation evidence in Ricks's affidavit was not new.

¶ 91    To the extent petitioner argues he did not discover that the State struck a deal with Ricks in exchange for Ricks's testimony against him until he received Ricks's affidavit where Ricks acknowledged he asked for leniency and ultimately received work release, we do not find that evidence is newly discovered.

¶ 92    The record shows that petitioner, in his *pro se* posttrial motion and initial postconviction petition, alleged Ricks's testimony was false and part of a fabrication done because of a deal struck with the State that they would obtain his early release from prison if he testified against petitioner. Petitioner argued the transcripts from his July 1992 parole revocation hearing would have supported those claims, and he attached unofficial transcripts to his initial postconviction petition.

¶ 93    In his successive postconviction petition, petitioner argues that in July 1992 a parole revocation hearing was held after his arrest in this case, as he was on parole at the time. Petitioner claims the prosecutor at his trial helped conceal the true motives behind Ricks's trial testimony where the prosecutor was present at the revocation hearing, which took place prior to trial. At the revocation hearing, Detective Akin testified that Ricks asked for help in his armed robbery case but they had not "given him anything so far." Petitioner argues that, although the prosecutor attended the parole revocation hearing, the prosecutor did not impeach Ricks's perjured trial testimony where Ricks stated at trial that he did not seek any favorable result for testifying. Petitioner attached the transcripts from the hearing.

¶ 94    While petitioner claimed his trial counsel was ineffective for failing to obtain the 1992 parole revocation hearing transcripts for use at trial, petitioner was present at the revocation hearing. Thus, the information provided at the 1992 revocation hearing was available before petitioner's trial, and petitioner failed to exercise due diligence in obtaining that information. Accordingly, we find the evidence in Ricks's affidavit was not new, and petitioner's argument that no amount of due diligence could have discovered the evidence in Ricks's affidavit sooner fails.

¶ 95    Having found petitioner cannot establish that the evidence in Barrier's and Ricks's affidavits is newly discovered, we need not address whether the evidence is material, not cumulative, or of such a conclusive character that it would probably change the result on retrial. Accordingly, we find petitioner fails to state a colorable claim of actual innocence based on the affidavits of Ricks and Barrier.

¶ 96    Next, we address petitioner's due process claims.

¶ 97                    C. Due Process Claims

¶ 98    Petitioner argues his successive postconviction petition established a *prima facie* showing of cause and prejudice that (1) the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when it concealed evidence that Ricks testified against petitioner in exchange for a promise of leniency on his armed robbery case and (2) the State violated his due process rights under *Napue v. Illinois*, 360 U.S. 264 (1959), when it knowingly relied on Ricks's perjured testimony about petitioner's alleged admissions to Harlib's death in exchange for leniency on his case.

¶ 99    The State argues petitioner cannot establish cause on either claim because he previously raised these claims in prior proceedings and petitioner fails to establish prejudice necessary to allege *Brady* and *Napue* claims.

¶ 100    A motion for leave to file a successive postconviction petition will be granted if the petitioner demonstrates both cause for his failure to bring the claim in his initial postconviction petition and prejudice resulting from that failure. 725 ILCS 5/122-1(f) (West 2020); *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). A petitioner establishes cause by identifying an objective factor that impeded his ability to raise a specific claim during his initial postconviction proceedings. 725 ILCS 5/122-1(f)(1) (West 2020). A petitioner shows prejudice by demonstrating that the claim not raised during his initial postconviction proceedings so infected the trial that the resulting conviction or sentence violated due process. *Id.* § 122-1(f)(2).

¶ 101    In this case, we find petitioner cannot establish cause for either of his claims where he raised them both in prior proceedings.

> "[A] [d]efendant cannot satisfy the cause prong of the test when he did, in fact, raise the specific claim he seeks to raise again in his successive petition. 'There can be no cause for failing to raise a claim in the initial proceeding when the claim was, in fact, raised in that proceeding.' " *People v. Montanez*, 2023 IL 128740, ¶ 106 (quoting *People v. Conway*, 2019 IL App (2d) 170196, ¶ 25).

See *People v. English*, 403 Ill. App. 3d 121, 131 (2010) (determining that *res judicata* prevented the petitioner from establishing "cause" for a successive postconviction petition when his ineffective assistance of counsel claim was the same as the claim in his initial petition, despite his successive petition including new affidavits supporting the claim).

¶ 102    Here, not only were petitioner's claims raised in his initial postconviction petition, but he also previously raised the claims in his posttrial motion. Specifically, in his *pro se* posttrial motion, petitioner argued Ricks's entire testimony was false and fabricated as part of a deal struck with the State that it would obtain his early release from prison if he testified; thus his testimony was part of coaching by the State in a manner that would assure a conviction. In his initial postconviction petition, petitioner argued the State used perjured testimony of Ricks and Detective Akin regarding Ricks's statements and what, in return, Ricks was promised and/or given for his testimony against him at trial. In support of his petition, petitioner attached an unofficial transcript from his parole revocation hearing and his own affidavit.

¶ 103    Moreover, the appellate court, in affirming the circuit court's dismissal of petitioner's initial postconviction petition at the first stage, stated petitioner "made his claims of perjury and suppression of evidence repeatedly to the circuit court and on direct appeal" and could not raise them again in a postconviction petition. See *Flournoy*, slip op. at 7.

¶ 104    Petitioner disagrees and argues that, where a petitioner previously raised a claim but lacked the necessary support, new evidence will establish cause for him to raise the claim again in a successive postconviction petition. Specifically, petitioner argues that, while he attempted to raise his claims that the State withheld exculpatory evidence and relied on perjured testimony in prior proceedings, until he obtained Ricks's affidavit recanting his testimony and admitting to an offer of leniency, he lacked the necessary support. In support, petitioner cites *People v. Wrice*, 2012 IL 111860. In *Wrice*, the defendant previously raised claims of police torture in earlier postconviction petitions, but the appellate court found, because a newly released report was not available at the time of those prior proceedings, that the defendant in his motion for leave to file a successive postconviction petition satisfied the cause prong of the cause-and-prejudice test. *Id.* ¶ 43. This court

affirmed the appellate court's holding that the defendant established cause. ¶ 49. We find *Wrice* distinguishable.

¶ 105    As stated above, the evidence in Ricks's affidavit was not new where it was available prior to trial. Thus, petitioner's argument that he lacked the necessary support to raise his due process claims in his initial postconviction petition is not persuasive. We find petitioner cannot establish cause for either of his claims where he raised them both in prior proceedings. Accordingly, because petitioner cannot demonstrate cause, we need not address the issue of prejudice.

¶ 106                    D. Ineffective Assistance of Trial Counsel Claim

¶ 107    Last, petitioner argues his successive postconviction petition made a *prima facie* showing of cause and prejudice that he was denied effective assistance of trial counsel based on Barrier's affidavit where she stated that trial counsel failed to interview her, even though she could have provided exculpatory evidence that Smith killed Harlib, and counsel misrepresented to the circuit court that he had contacted and spoken with her about testifying at petitioner's trial.

¶ 108    The State argues that petitioner cannot show cause, where he repeatedly claimed in prior proceedings that counsel was ineffective for not calling Barrier to testify, and that petitioner fails to establish prejudice, where his counsel's performance was not deficient and there is no reasonable probability, had counsel called Barrier to testify, that petitioner would have been acquitted.

¶ 109    For a petitioner to establish ineffective assistance of counsel in a successive postconviction petition, petitioner must establish both cause for his failure to bring the claim in his initial postconviction petition and prejudice resulting from that failure. 725 ILCS 5/122-1(f) (West 2020); *People v. Davis*, 2014 IL 115595, ¶ 56. As stated above, a petitioner establishes cause by identifying an objective factor that impeded his ability to raise a specific claim during his initial postconviction proceedings. 725 ILCS 5/122-1(f)(1) (West 2020). To establish prejudice for an ineffective assistance claim, petitioner must demonstrate (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced petitioner in that, absent counsel's deficient performance,

- 26 -

there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 110 In this case, we find petitioner cannot establish cause where he repeatedly claimed in prior proceedings that his trial counsel was ineffective for not calling Barrier to testify. In his *pro se* posttrial motion, petitioner argued his trial counsel was ineffective for failing to call Barrier to testify, when the information she provided in a police report initiated the case against petitioner, counsel was successful in locating Barrier, and she was willing to testify on his behalf. At the hearing on the posttrial motion, trial counsel acknowledged to the court that he spoke with Barrier and, while she never came right out and said Smith was involved in the shooting at the car dealership, she implicated Smith in the shooting at the car dealership. Counsel told the court that Barrier was able and willing to testify but that he decided not to call Barrier to testify because the main point of her testimony was to impeach Smith; Smith was not being called to testify because his testimony "would have been quite damning" for petitioner. The circuit court recognized that counsel decided not to call Barrier to testify.

¶ 111 In his initial postconviction petition, petitioner argued his trial counsel was ineffective for failing to call Barrier as a witness. Petitioner alleged his counsel spoke with Barrier before trial, she knew who committed the crime, and she was available to testify at trial that petitioner did not commit the crime. The appellate court found that trial counsel could reasonably decline to call Barrier as a witness, as a matter of trial strategy. *Flournoy*, slip op. at 7. The court further found that, without an affidavit from Barrier, it could not determine whether she could have provided any information or testimony favorable to petitioner. *Id.* at 10.

¶ 112 Petitioner argues he was denied effective assistance of trial counsel based on trial counsel's failure to interview Barrier when she could have provided exculpatory evidence. Petitioner contends that he can establish cause because the information in Barrier's affidavit was not available at the time of trial or when he filed his initial postconviction petition. Specifically, petitioner argues Barrier's affidavit attests that, prior to trial, she was unavailable and, contrary to counsel's representations, she never spoke with counsel before trial about testifying.

¶ 113 We find petitioner is attempting to relitigate his claim with an affidavit that was not submitted with the first postconviction petition. See *People v. Erickson*, 183 Ill.

2d 213, 226 (1998). As stated above, this court has recognized a petitioner is prevented from establishing "cause" for a successive postconviction petition when his ineffective assistance of counsel claim was the same as the claim in his initial petition, despite his successive petition including new affidavits supporting the claim. *Montanez*, 2023 IL 128740, ¶ 106 (citing *English*, 403 Ill. App. 3d at 131).

¶ 114    Here, petitioner is attempting to reframe his ineffective assistance of counsel claim, where he now claims his trial counsel was ineffective because he failed to interview Barrier when she could have provided exculpatory evidence. However, we find petitioner's claim is the same as what he has consistently asserted in previous proceedings—trial counsel was ineffective for failing to call Barrier as a witness when she could have provided evidence to support petitioner at trial.

¶ 115    Moreover, petitioner's argument, that the information in Barrier's affidavit was not available at the time of trial or when he filed his initial postconviction petition, is not persuasive. As stated above, the evidence in Barrier's affidavit about the information she knew regarding the shooting at the car dealership is not new. While Barrier states in her affidavit that she did not tell police the full truth, the record shows that Barrier had knowledge and provided information to police about the shooting at the car dealership implicating Smith's potential involvement. Thus, we find petitioner cannot establish cause where he raised his ineffective assistance claim in prior proceedings. Accordingly, because petitioner cannot demonstrate cause, we need not address the issue of prejudice. Ultimately, we find the circuit court properly denied petitioner's motion for leave to file a successive postconviction petition.

¶ 116                                III. CONCLUSION

¶ 117    For the foregoing reasons, we affirm the judgment of the appellate court, which affirmed the decision of the circuit court to deny petitioner's motion for leave to file a successive postconviction petition for his failure to present a colorable claim of actual innocence or demonstrate cause and prejudice as to his remaining constitutional claims.

¶ 118    Judgments affirmed.