2024 IL App (1st) 230813-U

No. 1-23-0813

Order filed December 10, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 16552 |
| | ) | |
| MARSHAUN BOYKIN, | ) | Honorable |
| | ) | Peggy Chiampas, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's order denying defendant leave to file a second successive postconviction petition is affirmed where his claim of actual innocence based on an alleged recantation by the victim is unsupported and contradicted by the record.

¶ 2    Defendant Marshaun Boykin appeals from an order of the circuit court of Cook County denying him leave to file his *pro se* second successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). On appeal, defendant contends the court erred when it denied him leave to file his petition because he stated a colorable claim of

actual innocence based on newly discovered evidence that the victim recanted her testimony and identification of him as the man who sexually assaulted her. We affirm.

¶ 3    Following a 2015 jury trial at which defendant represented himself, defendant was convicted of two counts of predatory criminal sexual assault of a child and sentenced to an aggregate term of 70 years' imprisonment. The facts of this case were presented in detail in our order affirming defendant's conviction on direct appeal. See *People v. Boykin*, 2018 IL App (1st) 151347-U. Here, we discuss the facts from the prior proceedings as necessary for consideration of the issue raised in this appeal.

¶ 4    At trial, M.W. testified that about 9 or 9:30 p.m. on May 11, 2011, when she was 12 years old, she was "raped" by defendant. M.W. knew defendant from the neighborhood and identified him in court. M.W. testified that she was outside when defendant grabbed her hand and walked her to the playground behind her elementary school. Defendant lifted M.W. up onto a step on the playground equipment, pulled down her shorts, unbuttoned his pants, and inserted his penis into her vagina. Defendant then inserted his penis into her anus. When he was finished, defendant walked away.

¶ 5    M.W. further testified that, when she went home, she told her mother what happened. An ambulance arrived at M.W.'s house and transported her to the hospital. There, M.W. told a nurse what defendant had done to her, and "samples" were taken from her vagina, anus, and back. A few days later, M.W. went to the Children's Advocacy Center, where she spoke with an interviewer and saw a doctor. A few months later, M.W. identified defendant in a lineup at the police station.

¶ 6    Sirkethia Haywood, M.W.'s mother, testified that she had previously met defendant through "a friend of my [other] daughter's baby's father's mother." She stated that earlier in the

afternoon of the day of the assault, M.W.'s demeanor was normal, but that when she saw M.W. again closer to 10 p.m., M.W. was afraid and unhappy and was crying. After speaking with M.W., Haywood called the police.

¶ 7    M.W.'s sister, Andrea Haywood, testified that she did not know defendant personally, but "saw [him] around" and knew him as "Ty." On the night in question, Andrea, M.W., and some other people were on a bench when defendant walked up to them. At some point, Andrea went to check on another sister and left M.W. on the bench by herself. When Haywood returned, M.W. was gone. Andrea testified that when M.W. came home, she was crying and had blood on her shorts.

¶ 8    Chicago fire department paramedic Jeffrey Thrun testified that he and his partner arrived at M.W.'s residence in an ambulance around 2:30 a.m. on May 12, 2011. M.W., who was shaky and afraid, told Thrun that around 10 p.m., she was going to the candy store when she was pulled around the corner by a person she knew and was sexually assaulted. Thrun and his partner transported M.W. to the hospital.

¶ 9    Nurse Capri Reese testified that she treated M.W. in the emergency room on May 12, 2011. M.W., who was crying and shaking, told Reese that she was walking to a candy store when she encountered a "known male" who became aggressive, pushed her to the side, and sexually assaulted her by penetrating her vaginally and anally. M.W. provided a physical description of the "known male." Reese and a doctor processed a criminal sexual assault evidence collection kit, which included collecting a blood sample, pubic hair combings, fingernail scrapings, vaginal swabs, and anal swabs. They also collected a swab of the right upper portion of M.W.'s back because M.W. indicated her assailant had salivary contact with her in that location. Reese sealed

the specimens in envelopes provided in the kit, along with the blood-stained underwear and shorts M.W. had been wearing at the time of the assault.

¶ 10    Dr. Antonio Navarrete, who treated M.W. in the emergency room, testified that M.W. stated that she was walking to a store when a man she knew accosted her, brought her to an isolated location, and sexually assaulted her vaginally and rectally. In addition to processing the criminal sexual assault evidence collection kit with Reese, Dr. Navarrete examined M.W.'s pelvic area and observed a recent hymenal tear that was bleeding. He explained in court that the fresh blood indicated that the wound could have happened less than a day prior to the examination. Based on Dr. Navarrete's observations, he opined that M.W. had been the victim of a sexual assault.

¶ 11    A forensic scientist with the Illinois State Police tested the vaginal and anal swabs contained in the kit and determined semen was present on both.

¶ 12    Chicago police detective Joseph Leyendecker testified that on May 18, 2011, he monitored an interview between an investigator and M.W. at the Children's Advocacy Center. During the interview, M.W. identified her attacker as "Ty" or "Marshaun." A few months later, Leyendecker learned that the crime lab had analyzed samples from M.W.'s criminal sexual assault evidence collection kit and associated the results with one state identification (SID) number in a database. The SID number was associated with two names: Tyrone Williams and Marshaun Boykin. Leyendecker explained that when one SID number is associated with two names, it indicates that the SID number "involve[s] one individual." Leyendecker further testified that on September 16, 2011, M.W. identified defendant in a lineup as the man who sexually assaulted her.

¶ 13    Lauren Schubert, a forensic scientist specializing in DNA analysis with the Illinois State Police, testified as an expert in the area of forensic biology, specializing in DNA analysis.

Schubert testified that she analyzed the vaginal swabs, anal swabs, and blood standard collected from M.W. In the sperm fraction of the vaginal swabs, Schubert identified a "full" male DNA profile at nine locations. In the mixed fraction from the vaginal swabs, Schubert identified a mixture of two DNA profiles. The major profile matched M.W. and the minor profile was a full male profile at 13 locations. The male profile was "the same male from the sperm fraction of the same swabs."

¶ 14    In the non-sperm fraction from the anal swabs, Schubert identified a mixture of two DNA profiles that included M.W. and the same male contributor identified from the vaginal swabs. Schubert explained that she found "information at all 13 locations" for the male profile; however, two of those locations had only partial information and, thus, the profile was incomplete at those two locations. In the sperm fraction from the anal swabs, Schubert identified a "complete" male DNA profile that was "the same male as all the others from this case."

¶ 15    Schubert entered the male DNA profile into a database which detected an association to Tyrone Williams, also known as Marshaun Boykin. Schubert testified that there were no other "candidates" in the search. Based on the results, Schubert requested a confirmatory forensic analysis standard from defendant.

¶ 16    Christine Prejean, a DNA analyst with the Illinois State Police Crime Lab, testified as an expert in DNA analysis. Prejean testified that she conducted DNA analysis on a buccal standard collected from defendant. She identified a 13-loci DNA profile from defendant's standard and compared it to the DNA profiles from the vaginal and anal swabs collected from M.W. Prejean found that the male DNA profile derived from the sperm fraction of the vaginal swabs matched defendant's DNA profile at 9 out of a possible 13 locations.

¶ 17 Prejean compared defendant's DNA profile to the full male 13-loci DNA profile found in the mixed fraction from the vaginal swabs and determined that they matched at all 13 loci. Prejean further testified that defendant's DNA profile matched the full DNA profile from the sperm fraction found on M.W.'s anal swabs. The full male DNA profile found in both the mixed fraction of the vaginal swabs and the sperm fraction from the anal swabs would be expected to occur in approximately 1 in 39 quadrillion black, 1 in 170 quadrillion white, or one in 27 quadrillion Hispanic unrelated individuals, which is the occurrence rate for 13-loci matches.

¶ 18 When Prejean compared defendant's DNA profile to the male DNA profile from the non-sperm fraction found on the anal swabs, she determined that defendant could not be excluded as having been a contributor. Prejean explained that the wording "cannot be excluded" was used because all 13 locations were tested, but "it was an incomplete profile at that 13."

¶ 19 Lynette Wilson, a DNA analyst with the Illinois State Police, testified as an expert in forensic DNA analysis. Wilson testified that she identified a mixture of two DNA profiles from the swab collected from M.W.'s back. Wilson found nine locations for the "full profile" of the major contributor, which was male and matched defendant's DNA profile. Wilson further found that M.W. could not be excluded as having contributed to the minor profile on that swab.

¶ 20 In closing, defendant argued to the jury, among other things, that the State failed to prove him guilty, that the State's witnesses lied, and that he was being framed to "take the fall for the young lady and her lover" and to prevent the Department of Children and Family Services from taking M.W. and her sisters from their mother. The jury found defendant guilty of two counts of predatory criminal sexual assault of a child. The trial court sentenced defendant to two consecutive terms of 35 years' imprisonment, for a total of 70 years.

¶ 21　On direct appeal, defendant solely argued that the trial court abused its discretion when it denied his pretrial *pro se* request to order the Illinois State Police to determine the number of nine-loci DNA matches in the Illinois DNA database. This court rejected that argument and affirmed defendant's convictions. *Boykin*, 2018 IL App (1st) 151347-U. In reaching our conclusion, we noted that this was not a case where the only identification evidence was a single nine-loci DNA match. *Id.* ¶ 45. Instead, here, the DNA evidence consisted of two 13-loci matches and two 9-loci matches identifying defendant as M.W.'s attacker. *Id.* In addition, we found the evidence showed that M.W. promptly, unequivocally, and consistently identified defendant as her attacker where she testified that she knew defendant prior to the assault; she told a paramedic, a nurse, and a doctor that she knew her attacker; she told the investigator at the Children's Advocacy Center that she knew her attacker as "Ty" or "Marshaun"; and she identified defendant in a police lineup and in court as the man who raped her. *Id.* ¶¶ 42, 44.

¶ 22　In 2019, defendant filed his initial *pro se* postconviction petition under the Act alleging that his appellate counsel rendered ineffective assistance because counsel failed to raise several issues on direct appeal which defendant had raised in *pro se* motions in the trial court. The circuit court summarily dismissed defendant's petition as frivolous and patently without merit. On appeal, this court allowed appellate counsel to withdraw, citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the circuit court's judgment. *People v. Boykin*, No. 1-19-0703 (2021) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 23　On May 18, 2022, defendant filed a *pro se* "Successive, Amended Post-Conviction Petition" under the Act which he labeled as his "2nd" petition. Therein, defendant alleged that (1) his arrest pursuant to an investigative alert was unconstitutional, (2) his right to counsel was

violated, (3) his prosecution was barred by double jeopardy and *res judicata*, and (4) his appellate counsel and "preliminary/arraignment hearing" counsel rendered ineffective assistance.

¶ 24    On July 12, 2022, defendant filed a *pro se* "Request for Production of Documents and order for the above 'Cause' " requesting all the transcripts in his case. Defendant also stated that he had not yet received a ruling on his successive postconviction petition. In addition, defendant stated that on June 19, 2022, M.W. visited him in prison and told him that another man had "initially" assaulted her, that defendant fit the description, and she was "coerced and forced" to lie at trial and testify that it was defendant who had assaulted her. Defendant stated that M.W. had agreed to speak on his behalf regarding why he was erroneously accused. He asked the court to "please contact the young lady" and included a telephone number.

¶ 25    Defendant attached his own unsworn "affidavit" to his pleading stating that M.W. told him that she told Detective Leyendecker that defendant was not the man who sexually assaulted her. M.W. told defendant that she was told to "just go along with it" because other people said defendant was "the right guy." Defendant claimed M.W. was threatened and coerced to appear at trial. Defendant stated that M.W. told him that the man who assaulted her was "still on the streets."

¶ 26    On August 19, 2022, the circuit court denied defendant leave to file his successive postconviction petition. On October 5, 2022, defendant filed a *pro se* notice of appeal that was denied as late. Defendant did not pursue leave to file a late notice of appeal with this court.

¶ 27    On October 20, 2022, defendant filed a *pro se* "supplemental motion" asking the circuit court to reconsider his successive postconviction petition "based on newly discovered evidence." Therein, defendant alleged that his "extended term" sentence was unconstitutional, that he was charged under the wrong statutory code, that the second count of predatory criminal sexual assault

should have been dismissed because it was one crime against one person; and that his appellate counsel was ineffective for failing to argue on direct appeal that defendant was ineffective as his own counsel at trial. Defendant also stated that, if the State's plea offer was still available, he wanted to accept it.

¶ 28 Defendant attached an amended successive postconviction petition to his motion raising his new claims and rearguing some claims raised in his initial and successive petitions. Defendant also stated that on June 26, 2022, M.W. visited him in prison "to do a 'confession.'"

¶ 29 Defendant attached to his petition two partial computer printouts he claimed were prison visitor logs showing M.W. visited him on June 25 and 26, 2022. Defendant also attached his own notarized affidavit in which he stated that M.W. visited him on June 26, 2022, apologized, and said "she could not live her life knowing that she was the reason an innocent man was convicted for a crime he did not do." Defendant averred that M.W. told him that, on the date at issue, "she had a sexual encounter with someone, and they got caught by a neighbor and the police showed up, she told her mom the description of the person but that she did not really know him." Defendant stated that M.W.'s mother asked M.W.'s sister and the sister's boyfriend if they knew someone who fit the description, and they said defendant "has braids and so does Marcus and Kenny."

¶ 30 Defendant further averred that M.W. told him "she told the police she didn't know the guy unless she saw him." He further stated, "[s]he said she viewed the line-up and told the detectives that the guy was not in there." Defendant said M.W. told him her two sisters and her sister's boyfriend told the detectives that they recognized defendant, a detective pulled them aside and spoke to them quietly, and before they could leave, the detective asked them to sign a piece of paper, which they all refused to do. Defendant stated that M.W. told him she did not hear anything

more until four years later when the sheriff served her with a subpoena to testify at trial. Defendant stated that M.W. "was told she had no choice unless she wanted to loose [*sic*] custody of her child (If she didn't say [defendant] was the person who done this crime)."

¶ 31 Defendant further stated that M.W. told him the only reason her mom, sisters, and sister's boyfriend came to the trial was "because the detectives paid them to go along with the story and they agreed." He said, "she also said that the rape kit was not actually done on her, but her clothes, (so they lied!)." Defendant stated,

> "She also said that she and her family received a survivors benefit fund for rape victims. She said the detectives and states attorney really wanted somebody to go down for this case and because they could not find and identify the other two suspects, that left me as the only person they had to put the case on. She told me that if called, she would be willing to testify to these statements, cause there is no way I should even be in prison."

¶ 32 Defendant stated that M.W. told him she would return to the prison to sign an affidavit but did not do so. He averred, "she told me that she has been threatened to not come see me or speak to me ever again, she did not tell me by whom." Defendant asked that M.W. be called as a witness to testify to the truthfulness of his affidavit and included a telephone number. On November 14, 2022, defendant filed an identical copy of his October 20 postconviction petition and attachments.

¶ 33 On December 2, 2022, the circuit court denied defendant's supplemental motion to reconsider his successive postconviction petition based on newly discovered evidence filed on October 20 and November 14. The court found that defendant had not submitted any newly discovered evidence in support of his motion to reconsider, nor had he alleged that the court erred in applying the law or that the law had changed. The court specifically addressed some of the

allegations raised in defendant's motion but did not comment on defendant's claim that M.W. had visited him, or any of the statements in his affidavit regarding what M.W. had allegedly told him.

¶ 34    On March 1, 2023, defendant filed the *pro se* second successive postconviction petition at issue here titled "Newly Discovered Evidence Post-Conviction #3." Therein, defendant stated that M.W. initiated contact with him by emailing him in prison "on or about 4-6-21 or 4-6-22." Defendant stated that he spoke on the phone with M.W. on numerous occasions and she decided that she wanted to visit him in person "to explain why she was told to say [that defendant had] raped her." Defendant stated, "[s]he fully acknowledges that she was coerced by the arresting officers."

¶ 35    Defendant stated that M.W. visited him at the Joliet treatment facility on June 25 or 26, 2022. He further stated that the visiting logs and video monitoring of their conversation was available by contacting "counselor Rossi" at the "Joliet treatment facility," and he included telephone numbers to contact Rossi and M.W. Defendant stated that he drafted a sworn affidavit of the information M.W. told him during their visit. He asserted that his affidavit was newly discovered evidence that had not yet been considered or ruled upon by any court.

¶ 36    Defendant attached to his petition the same two printouts of the purported visitor logs and the first page only of the same two-page affidavit he previously attached to his motions to reconsider his first successive postconviction petition detailed above. See *supra* ¶¶ 27-29. Because the second page was missing, the "affidavit" attached to this petition did not explain why defendant did not provide an affidavit from M.W., nor was the "affidavit" signed by defendant or notarized.

¶ 37    Also on March 1, defendant filed a *pro se* petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2022)) raising the same

allegation as his third postconviction petition that M.W. had visited him in prison and said she was coerced to make false allegations against him. Defendant asked the court to determine which of his two pleadings was the proper petition for addressing his issue.

¶ 38 On March 22, 2023, the circuit court denied both of defendant's petitions. The court found that defendant's section 2-1401 petition was duplicative of his third postconviction petition and the wrong vehicle for raising his claim. Consequently, the court elected not to recharacterize the section 2-1401 petition and denied it. The court further found that defendant's claim of actual innocence based on his visit with M.W. and his supporting affidavit and visitor logs were previously submitted with his pleadings filed on October 20 and November 14, 2022. Therefore, the court found his claim of actual innocence barred by *res judicata*. In addition, the court found that defendant's evidence predated his successive postconviction petition filed on May 18, 2022, and, thus, the evidence was not newly discovered. The circuit court concluded that defendant failed to state a colorable claim of actual innocence and denied him leave to file his second successive postconviction petition.

¶ 39 On May 18, 2023, this court granted defendant's motion for leave to file a late notice of appeal to address the circuit court's orders entered on December 2, 2022, and March 22, 2023.

¶ 40 On appeal, defendant contends the circuit court erred when it denied him leave to file his second successive postconviction petition because he properly raised a colorable claim of actual innocence based on M.W.'s "confession" that she was coerced to identify defendant as her attacker and testify against him. Defendant argues that his claim is not barred by *res judicata* because, although he raised it in his motion to reconsider his successive postconviction petition based on newly discovered evidence filed on October 20 and November 14, 2022, the circuit court did not

expressly rule on the merits of his claim when it denied his motion on December 2, 2022. Defendant further argues that he could not have raised his claim in his successive postconviction petition filed in May 2022 because M.W.'s recantation occurred in June 2022 when she visited him in prison. Defendant maintains that his affidavit detailing M.W.'s recantation and the purported visitor logs showing M.W. visited him in prison constitute newly discovered evidence that can exonerate him at a retrial.

¶ 41 The State responds that defendant failed to raise a colorable claim of actual innocence because his claim is positively rebutted by the record where the DNA evidence presented at trial affirmatively and incontestably demonstrates that M.W.'s alleged recantation is false. The State argues that the DNA evidence definitively identified defendant as the man who sexually assaulted the 12-year-old victim vaginally and anally. The State agrees with defendant that his claim is not barred by *res judicata* because the circuit court never ruled on the claim when defendant raised it in his motion to reconsider. The State further acknowledges that the circuit court erred when it found that the alleged recantation predated defendant's successive postconviction petition. Nevertheless, the State argues that the circuit court's errors are irrelevant because this court may affirm the denial of leave to file defendant's third postconviction petition on any basis in the record.

¶ 42 We review the circuit court's denial of leave to file a successive postconviction petition *de novo*. *People v. Dorsey*, 2021 IL 123010, ¶ 33. The Act provides a process whereby a prisoner can file a petition asserting that his conviction was the result of a substantial denial of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2022); *Dorsey*, 2021 IL 123010, ¶ 31. Both the legislature and our supreme court have made it clear that only one postconviction proceeding is contemplated

under the Act. *People v. Edwards*, 2012 IL 111711, ¶ 22. It is well settled that successive postconviction petitions are disfavored. *Id.* ¶ 29.

¶ 43 Pursuant to section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2022)), defendant is prohibited from filing a successive postconviction petition without first obtaining leave of court. *People v. Lusby*, 2020 IL 124046, ¶ 27. Leave to file a successive petition that raises a claim of actual innocence should be denied only where it is clear from a review of the petition and the supporting documents that, as a matter of law, the petition does not present a colorable claim of actual innocence. *People v. Flournoy*, 2024 IL 129353, ¶ 77. Leave to file should be granted when the supporting documentation raises the probability that it is more likely than not that, based on the new evidence, no reasonable juror would have convicted defendant. *People v. Robinson*, 2020 IL 123849, ¶ 44.

¶ 44 "At the leave-to-file stage of successive proceedings, 'all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true.' " *Flournoy*, 2024 IL 129353, ¶ 77 (quoting *Robinson*, 2020 IL 123849, ¶ 45). The circuit court is precluded from making any factual and credibility determinations during the leave-to-file stage. *Flournoy*, 2024 IL 129353, ¶ 77. Moreover, our supreme court has concluded that hearsay evidence should be considered in evaluating postconviction claims, explaining that rules of evidence, including hearsay, do not apply to postconviction hearings. *Robinson*, 2020 IL 123849, ¶¶ 77-80.

¶ 45 "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47. Newly discovered

evidence is that which was discovered after trial and could not have been discovered by the defendant earlier through due diligence. *Id.* Evidence is material when it is relevant and probative of the defendant's innocence. *Id.* Evidence is noncumulative when it adds to the information heard by the fact finder at trial. *Id.* Finally, evidence is considered to have conclusive character if, when considered together with the trial evidence, it would probably lead to a different result. *Id.* "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.* The ultimate question is whether the new evidence supporting the postconviction petition places the trial evidence in a new light and undermines the court's confidence in the guilty finding. *Id.* ¶ 48. It is not necessary that new evidence be completely dispositive of an issue to be likely to change the result on retrial. *Id.* Probability, not certainty, is the key when determining whether the fact finder would reach a different result when considering the trial evidence and new evidence together. *Id.*

¶ 46    The Act requires a defendant to provide affidavits, records, or other evidence to show that the allegations in his postconviction petition are capable of objective or independent corroboration. *People v. Allen*, 2015 IL 113135, ¶ 26 (citing *People v. Collins*, 202 Ill. 2d 59, 67 (2002)). An affidavit is a declaration made under oath, in writing, and sworn to before a person who has the legal authority to administer oaths. *People v. Brown*, 2014 IL App (1st) 122549, ¶ 56. An affidavit must be based upon the affiant's personal knowledge upon which he could competently testify at an evidentiary hearing. *Id.* An affidavit or other supporting documentation submitted with a postconviction petition "must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *People v. Delton*, 227 Ill. 2d 247, 254 (2008).

¶ 47    Here, defendant's claim that he has "newly discovered evidence" that M.W. was coerced to identify him as the man who sexually assaulted her, and that she has now recanted her identification and trial testimony, is solely supported by two partial computer printouts of purported visitor logs showing that M.W. visited him in prison and defendant's own unsigned "affidavit" attesting to what M.W. allegedly told him.

¶ 48    Initially, we note that the purported "visitor logs" attached to defendant's petition are not of a character that would show that the allegations in defendant's postconviction petition are "capable of objective or independent corroboration." *Allen*, 2015 IL 113135, ¶ 26.  The purported visitor logs list 14 entries, including dates and "visitor" names, including four instances in which M.W.'s name appears. The logs, however, have no identifying information regarding where they came from, who created them, or what they mean.

¶ 49    Moreover, defendant's own statement attached to his second successive postconviction petition is insufficient to support his claim of actual innocence. The document defendant submitted with his petition is missing the second page that was included with his previous pleadings and, thus, it is not signed or notarized. See *Brown*, 2014 IL App (1st) 122549, ¶ 56. Technical deficiencies aside, we find that defendant did not present a colorable claim of actual innocence.

¶ 50    As explained above, at the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. *Robinson*, 2020 IL 123849, ¶ 45. Our supreme court has stated that "[f]or new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.*, ¶ 60. As an example of evidence that

would qualify as "positively rebutted," the supreme court pointed to its prior decision in *People v. Sanders*, in which a witness recanted his trial testimony implicating defendant in the shooting of the victim, claiming instead that the witness had shot the victim once, despite autopsy evidence showing that the victim had been shot twice and died of multiple gunshot wounds. *Id.*, ¶¶ 59-60, citing *Sanders*, 2016 IL 118123, ¶¶ 48, 55.

¶ 51 As in *Sanders*, defendant's new evidence—M.W.'s alleged recantation—is positively rebutted by the indisputable scientific evidence presented at trial, because that scientific evidence affirmatively and incontestably demonstrates that the recantation is false or impossible. The DNA evidence presented at trial definitively identified petitioner as the man who vaginally and anally raped the 12-year-old victim. DNA testing showed that the DNA evidence from the mixed fraction from the vaginal swab, as well as from the sperm fraction from the anal swab, were full profile matches to defendant's DNA profile at all thirteen locations, and that the likelihood of such matches was one in 39 quadrillion Blacks, one in 170 quadrillion whites, or one in 27 quadrillion Hispanic unrelated individuals. Additionally, the sperm fraction from the vaginal swabs and the major profile from the swab of the victim's back each resulted in a DNA profile at nine out of a possible thirteen locations that matched defendant's profile. The profile from that sperm fraction and from the victim's back was expected to occur in approximately one in 70 billion Blacks, one in 100 billion whites, or one in 85 billion Hispanic unrelated individuals.

¶ 52 In these circumstances, we find that defendant has not presented a colorable claim of actual innocence, where the evidence of M.W.'s alleged recantation does not raise the probability that it is more likely than not that no reasonable juror would have convicted defendant. *Robinson*, 2020

IL 123849, ¶ 44. Accordingly, the circuit court did not err when it denied defendant leave to file his second successive postconviction petition.

¶ 53    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.