2026 IL App (1st) 231497

No. 1-23-1497

First Division
February 23, 2026
Modified upon denial of rehearing April 20, 2026

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 94 CR 21182-01 |
| BRANDON JOHNSON, | ) ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | James M. Obbish, |
| | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**OPINION**

¶ 1    In 1995, following a jury trial, defendant-appellant Brandon Johnson was found guilty of first degree murder, attempted first degree murder, aggravated battery with a firearm, and armed violence and sentenced to 60 years' imprisonment for murder and 30 years' imprisonment for the other charges, to be served concurrently. He now appeals from the circuit court's judgment denying his motion for leave to file his successive petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), arguing that his petition

presented a colorable claim of actual innocence and also satisfied the cause-and-prejudice test for his general due process violation claim and his claim that he was denied his right to due process guaranteed under *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons that follow, we reverse in part, affirm in part, and remand for further proceedings under the Act.

¶ 2                                    I. BACKGROUND

¶ 3      On August 2, 1994, defendant was arrested, along with his codefendant Antoine Mason, for the shooting death of seven-year-old Bernard Harris and injury to William Thurman. Defendant's case proceeded to a separate jury trial, which began on October 24, 1995.

¶ 4      Ronnie Smith, a member of the Vice Lords gang, testified that, on July 31, 1994, at about 8:45 p.m., he walked from his house to the E&J, a liquor store. As he was approaching the store, he saw an individual named "Mad Dog" and a second person running away from the store. He also observed two vehicles parked in front of the store: a maroon car and a brown truck. The maroon car had a single person in it and was parked on the street, and the brown truck was in a parking area between the maroon car and the store. Defendant, also known as "Shorty B," and another person, who went by the name "Shorty Gang Bang" as well as "Twan," walked through an alley near the store. Shorty Gang Bang walked up to the maroon car, while defendant stood by the front door of the store with a .357 revolver in his hand. Smith testified that he had seen that gun on previous occasions at defendant's house. Shorty Gang Bang fired an automatic weapon twice into the maroon car, and defendant also began firing his gun towards the maroon car while walking towards the payphone near the door of the store. Smith testified that defendant fired five or six shots, and the brown truck started to move, coming between defendant and the maroon car as defendant was shooting. The shooting lasted approximately 15 seconds. Later, Smith went to defendant's house, where defendant stated that he and Shorty Gang Bang shot some Chief Stones

(a rival gang) near the E&J. A few days later, the police came to Smith's house, but he did not say anything about the shooting initially because he did not want to get involved. The police took him to the station, where he repeated defendant's statements to the detectives. Eventually, after learning that a young child had been killed, Smith informed them that he was a witness to the shooting. He confirmed that an assistant state's attorney interviewed him and took a handwritten statement in accordance with Smith's eyewitness account of the shooting.

¶ 5     On the morning of the trial, defendant and Smith were brought to the courthouse together, during which time defendant asked Smith if he was going to "trick on" him. Smith also testified that, in June 1995, he pled guilty to unlawful possession of a firearm and, while on probation, he failed to report to his probation officer. As a result of that violation, he was required to serve 21 days in the Cook County jail. He confirmed that no deals were made in exchange for his testimony.

¶ 6     On cross-examination, Smith admitted that he was a suspect in the case and was held at the police station in "a little room" until he agreed to testify before the grand jury. During the grand jury hearing, Smith testified that defendant fired two shots. Smith further confirmed that the only individuals he saw outside the E&J that night were defendant and Shorty Gang Bang.

¶ 7     Eric Martin testified that, on the night of the shooting, he and three friends, Thurman, Germaine Irving, and Ricky Harris (Ricky) went to the E&J in Thurman's maroon car. Thurman parked the car on the street in front of the E&J. Martin observed a brown truck also parked in front of the store. Irving and Ricky went into the store, while he and Thurman, who was in the driver's seat, remained in the car. After five minutes, Martin went into the store to see what was taking so long. He did not observe any other people outside the E&J at that time. When he exited the store approximately five minutes later, there were 10 to 15 young men standing outside the store. Martin knew these men to be members of the Vice Lords. Several of these men knocked Martin to the

ground and began kicking him. He stood up and ran away from the store. As he was running, he heard about six gunshots coming from the area near the store. On cross-examination, Martin testified that he viewed a lineup on August 2 at the police station and identified Kenyatta Cursey as being one of the men standing outside the E&J when he exited the store. Defendant was in the lineup, but Martin did not identify him. Martin confirmed that he did not see defendant outside of the store.

¶ 8     Thurman testified that, on the night in question, he drove Irving, Ricky, and Martin to the E&J, and he parked on the street. A brown truck was parked between his car and the store. He stayed in the car while the others went inside the store. He observed a group of about seven or eight young men outside of the store. At one point, he went into the store, but he soon came back out. While he was in his car with the windows rolled down, a man approached the passenger side of the car and asked him if he was "Big Chief." Thurman responded that he was "Big Will." The individual then asked "his friend for his piece" and subsequently pointed a gun at Thurman, who opened the door and rolled out of the car as three shots were fired. Thurman testified he was shot in his upper thigh. After exiting the car, Thurman ran across the street where he fell to the ground. He heard more gunshots while he was running across the street. At some point, Thurman went to the police station where he was shown a photo array, and from that group of photos, he identified the individual who shot him, who he later learned was Mason. He testified that he did not see anyone else shooting that night.

¶ 9     Johnny Harris (Harris) testified that, on July 31, 1994, he drove his seven-year-old son, Bernard, and his one-year-old grandson to the E&J in his brown pickup truck to purchase diapers, as well as candy and ice cream for the children. When he went into the store with the children, there was no one outside of the store. When he exited the store, there were about 15 people standing

outside. After returning the children to the passenger's side of the truck, Harris bumped into four men who were speaking with a man inside of a red car. Harris entered the driver's side of his truck. At this time Harris believed "something was going to start happening," and he started his truck quickly. He testified that, near the red car, one man was giving another a gun and then he heard shooting. He also saw another man standing near the phone outside of the store, who was also shooting a gun in the direction of his truck. He began to drive away, but his son had already been shot. Harris took his son to the hospital, where he was taken by helicopter to another hospital, but Bernard died in transit as a result of a gunshot wound to the head.

¶ 10    A couple days later, Harris went to the police station to view a lineup. From that lineup and subsequently in court, he identified the man standing near the phone who was shooting towards his truck as defendant. When asked on direct examination if he was 100% certain that that was the person who was shooting in his direction, Harris responded:

> "At the time when they was asking me that same day, they asked me was this and that, and it was—like it happened too fast, I really didn't try to—I come back to my senses to realize until I focused back exactly how things happened after they took you over it about a thousand times. Then I pointed the guy out."

On redirect examination, Harris testified that he was "98 percent positive."

¶ 11    Kenyatta Cursey testified that he and a friend, Tyrell Payne, went to the E&J around 9 p.m. the night of the shooting. Cursey was a member of the "Reuben Nights," a faction of the Blackstones gang, that "got along with" the Vice Lords. He waited outside the store, where he saw Shorty Gang Bang and some other men arguing with a man in a red car parked on the street in front of the store. Shorty Gang Bang, who was standing on the passenger side of the car, pulled out a black and silver automatic gun and shot towards the driver's side two or three times. Cursey

ran away at this point, and he heard about six more gunshots. He did not remember seeing anyone else with a gun that night.

¶ 12    A few days later, Cursey was brought to the police station, where he provided his account of the shooting. He testified that he could not recall to whom he spoke or whether they wrote down his statement; however, he did identify a statement containing his signature. Cursey was again asked if he saw anyone else with a gun that night, and he responded that he did not remember. He also testified that he did not remember whether he saw Shorty B outside the store firing a revolver. He did not remember viewing a photo array at the police station or any of his testimony before the grand jury. Cursey affirmed that he was not threatened at the police station to give his statement nor was he threatened to testify before the grand jury. He was also not promised anything in exchange for his testimony. On cross-examination, Cursey testified that, at the time he made the statement to the police, it "seemed" like he had been there for "weeks" and he was not permitted to leave until he testified before the grand jury.

¶ 13    John Kirby, a former assistant state's attorney, testified that, on August 3, 1994, he interviewed Cursey at the police station, and in a statement, written by Kirby and signed by Cursey, Cursey stated that Shorty Gang Bang fired into the maroon car and he observed Shorty B coming from the direction of the payphone with a black revolver in his hand. Shorty B then fired a black gun in the direction of the maroon car as he ran towards 55th Street. Cursey also identified a photo of defendant as Shorty B.

¶ 14    An assistant state's attorney testified that at the grand jury hearing, Cursey testified in conformity with the written statement.

¶ 15    Detective Craig Cegielski testified that he was not involved in the initial investigation on the night of the shooting or the following day. He became involved on August 2, 1994, when he

was informed that Smith was at the police station and Cegielski interviewed him. As a result of that conversation, law enforcement began looking for Mason and defendant. Cegielski had another conversation with Smith, which led law enforcement to defendant's grandmother's home. Defendant was found at that location and taken into custody. Before returning to the police station, Cegielski located Robert Gladney,[1] whose name had also been provided to him in his investigation of the shooting. Cegielski also located Thurman and brought him to the station where a lineup including defendant, Smith, and Gladney, was conducted. Thurman did not identify any individuals from the lineup. Defendant was subsequently released from custody because he was a juvenile and could only be held for six hours. Cegielski then contacted Detectives John Halloran and James O'Brien because they were the initial detectives assigned to the investigation and informed them of the investigation's progress.

¶ 16 Detective O'Brien testified that the initial detectives investigating the shooting were himself and Detectives Halloran, Kenny Boudreau, and Jerry Carroll. On the night of the shooting, after speaking with the security guard at the E&J, O'Brien had the names Shorty Gang Bang and Shorty B, which he later learned were the nicknames of Mason and defendant, respectively. O'Brien learned from other officers that both individuals were Vice Lord gang members. O'Brien further testified that he and Halloran came into the police station on their day off and spoke with several witnesses, including Smith, Gladney, and Thurman. Subsequently, the detectives conducted a lineup that included defendant and that was viewed by a number of witnesses. Regarding Harris's identification of defendant in the lineup, O'Brien characterized the identification as "tentative" because he was not 100% certain.

---

[1]Gladney's name is spelled differently throughout the record.

¶ 17    Additional Chicago police officers testified that two .40-caliber cartridge casings, a 9-millimeter cartridge case, and spent bullets were recovered from the scene; the .40-caliber casings were from the same weapon, either a Glock pistol or a Smith & Wesson Sigma semiautomatic firearm; and another bullet was consistent with either being .38-caliber or 9-millimeter.

¶ 18    Closing arguments then began. Relevant here, defense counsel challenged the reliability of the identifications made by Cursey and Smith, and on rebuttal, the State argued that if the jury was to believe defense counsel's argument, they would have to believe that "the police were in on this" and "fed into this." The State repeated similar phrases later in its rebuttal and also stated that the jury would have to believe that the police "forced the hand of Mr. Harris" to identify defendant and suggested that if the police were in on this, then it was not "a good frameup."

¶ 19    The jury found defendant guilty of first degree murder, attempted first degree murder, aggravated battery with a firearm, and armed violence. Defendant filed a posttrial motion, which the circuit court denied. Following a sentencing hearing, the court sentenced defendant to 60 years' imprisonment for first degree murder as well as 30 years' imprisonment for the other charges, to be served concurrently.

¶ 20    This court affirmed defendant's conviction on direct appeal (*People v. Johnson*, No. 1-96-0050 (1997) (unpublished order under Illinois Supreme Court Rule 23)), and the supreme court denied his petition for leave to appeal (*People v. Johnson*, 175 Ill. 2d 541 (1997) (table)).

¶ 21    On August 17, 1999, defendant filed his initial *pro se* postconviction petition, alleging that he received ineffective assistance from trial counsel, as well as ineffective assistance from appellate counsel for failing to raise the trial counsel ineffectiveness claim on direct appeal. On September 3, 1999, the circuit court summarily dismissed defendant's petition. On March 30,

2001, this court affirmed the circuit court's judgment. *People v. Johnson*, No. 1-99-3632 (2001) (unpublished order under Illinois Supreme Court Rule 23).

¶ 22    On March 24, 2023, defendant, through The Exoneration Project at the University of Chicago Law School, filed a motion seeking leave to file a successive postconviction petition, which is the subject of this appeal. Defendant raised five claims in the petition: (1) actual innocence; (2) denial of due process based on newly discovered evidence of a pattern and practice of investigative misconduct; (3) a *Brady* claim based upon the State's "failure to disclose evidence of police officers' patterns and practices of misconduct, including those allegations which pre-date petitioner's trial"; (4) ineffective assistance based on trial counsel's failure "to learn of the evidence contained in this petition" and "other evidence to which [defendant] does not yet have access"; and (5) a "cumulative effect" claim.

¶ 23    Multiple exhibits were attached to the petition. First, the affidavit of Darryl Johnson (Darryl), of no relation to defendant, was attached, as well as the affidavit of an investigator from The Exoneration Project, Cindy Chekingo. Chekingo averred that she met with Darryl on March 2, 2023, and he provided her with the attached affidavit, which he prepared in 2014. Darryl was previously in a relationship with codefendant Mason's mother, and the affidavit was prepared to assist Mason. Darryl indicated to Chekingo that "because he has family connections to [Mason], he did not come forward sooner to assist [defendant]."

¶ 24    In the affidavit, Darryl details two conversations he had with witnesses to the shooting. While incarcerated in the Cook County Jail, Darryl encountered Smith, who informed him that, to avoid being charged with murder, he was "coerced into making and signing a statement by detectives." Darryl also spoke with Robert Gladney, who was a witness but did not testify at defendant's trial. In 2002, while Darryl was on a work release pass, Gladney visited Darryl's home

and stated that Mason had been "trying to put the mess on him." Gladney further stated to Darryl that, after Mason fled the scene that night, Cursey "came running shooting at the car Thurman was getting out of and as he was shooting he shot the boy in the truck."

¶ 25 Second, defendant attached evidence of the detectives "pattern and practice of misconduct." Defendant asserted that collateral estoppel prevented the State from contesting the existence of the detectives' pattern and practice of misconduct. To that end, a compact disc was attached which contained the record on appeal that was before the appellate court in *People v. Anderson*, 2023 IL App (1st) 200462 (defendant's convictions vacated and remanded for new trials on grounds pertaining to the scope of the Illinois Torture Inquiry and Relief Commission Act (775 ILCS 40/1 *et seq.* (West 2018))), which related to an Illinois Torture Inquiry and Relief Commission (TIRC) proceeding involving, *inter alia*, Halloran, O'Brien, and Boudreau.

¶ 26 In *Anderson*, the defendant alleged that his convictions resulted from the torture by several Chicago police detectives in August 1991. *Anderson*, 2023 IL App (1st) 200462, ¶ 1. This court held that the voluminous evidence of police abuse would likely have altered the result of the suppression hearing. *Id.* ¶ 3. As relevant here, the court observed that O'Brien, Halloran, and Boudreau were each accused by over 30 individuals of coercion and physical abuse. *Id.* ¶ 58. By including the appellate record from *Anderson*, defendant here has submitted the same voluminous evidence presented to that court, including "prior hearing and deposition testimony, motions to suppress, witness affidavits, expert reports, and postconviction filings relating to allegations." *Id.* ¶ 94.

¶ 27 For example, in a 2008 deposition taken for Hill v. City of Chicago, No. 06 C 6772 (N.D. Ill.), Kilroy Watkins testified that, in 1992, during questioning conducted by Halloran, Boudreau slapped and choked him while he was handcuffed to a wall. Halloran, Boudreau, and an assistant

state's attorney later returned and gave him a "prepared statement," and when he attempted to read it, Boudreau grabbed him "on the side of the neck" and stated that they did not have time for that. Watkins then signed the statement. Watkins further testified that, during this interrogation, he repeatedly requested a phone call but was informed that his request would only be accommodated after questioning was completed. He also requested to use the restroom, but Halloran and Boudreau refused.

¶ 28    Harold Hill was deposed in that same case in 2007 and also provided testimony during a 2010 evidentiary hearing in criminal proceedings involving Watkins.[2] On those two occasions, Hill testified that, in 1992, Boudreau and Halloran interviewed him and coerced him into a confession. While handcuffed to a wall, Boudreau beat, slapped, and yelled at Hill and "fed information" to Hill to include in his inculpatory statement, which he later provided to an assistant state's attorney.

¶ 29    As to Halloran, he was accused of misconduct by at least nine individuals, including Clayborn Smith (see *People v. Smith*, 2025 IL App (1st) 231740-U) and Johnny Plummer (see *People v. Plummer*, 2021 IL App (1st) 200299). In 2008, Halloran invoked the fifth amendment (U.S. Const., amend. V) when questioned on these allegations.

¶ 30    As to Boudreau, he was accused of misconduct by at least seven individuals. In 2005, during an investigation into these allegations, Boudreau invoked the fifth amendment.

¶ 31    As to O'Brien, in a TIRC recommendation for Anderson's claim, the commission observed that O'Brien had been named in "coercion allegations approximately 50 times" and a judge had described O'Brien's record of misconduct as "staggering" and "damning." This same document

---

[2]We are unable to discern from the transcripts included in the exhibit the precise nature of these proceedings, other than they were criminal.

also noted that Halloran had been named in over 50 coercion complaints and Boudreau was "notorious" for obtaining confessions for crimes that took place while the individual was in jail. In 2008, O'Brien invoked the fifth amendment when questioned about various allegations of misconduct.

¶ 32    Specific examples of these detectives' misconduct allegations include the following: (1) O'Brien and Halloran held Stanley Gardner in a cold interview room, beat him, did not permit him to use the restroom, and threatened to kill him to coerce him into a confession; (2) in 1995, O'Brien held a gun to Oscar Gomez's head after Boudreau and Halloran physically abused him and denied him sleep, food, and water; (3) Clayborn Smith was physically abused throughout multiple interrogations by O'Brien, Halloran, and Boudreau to coerce him into confessing; (4) in 1992, Dan Young Jr. was hit and kicked by the detectives before he falsely confessed to rape and murder; and (5) in 1991, O'Brien beat Marcus Wiggins with a flashlight, Boudreau spit on him, and Wiggins was later given a prepared inculpatory statement, which he initialed.

¶ 33    Defendant also attached to his petition a circuit court order entered on February 10, 2023, in *People v. Smith*, No. 92-CR-2559601 (Cir. Ct. Cook County, Feb. 10, 2023), holding that collateral estoppel principles barred the State from contesting that Halloran and Boudreau engaged in a pattern and practice of misconduct in similar cases between 1990 and 2001. See *Smith*, 2025 IL App (1st) 231740-U, ¶ 18 (acknowledging the entry of this order).

¶ 34    Defendant then explains how the pattern and practice of the detectives' misconduct may have affected the investigation of this case and his trial. According to defendant, Halloran "was extensively involved in every aspect of the investigation of this case," including taking the statements of Cursey and Smith, administering the lineups viewed by Harris and Martin, and interviewing Thurman. Boudreau "was heavily involved in the investigation," where the police

reports indicate that he was "involved in interviewing and/or interrogating" Cursey, Smith, Thurman, and Martin. He was also involved in defendant's arrest. O'Brien "was involved in interviewing and/or interrogating" Cursey, Smith, Thurman, Harris, and Martin. He was also the author of most of the police reports.

¶ 35    On July 12, 2023, the circuit court denied defendant leave to file his successive postconviction petition.

¶ 36    This appeal followed.

¶ 37                                  II. ANALYSIS

¶ 38    On appeal, defendant argues that the circuit court erred in denying his motion for leave to file a successive postconviction petition where (1) he presented a colorable claim of actual innocence, (2) he satisfied the cause-and-prejudice test for his claim that he was denied his right to due process guaranteed under *Brady*, 373 U.S. 83, and (3) he satisfied the cause-and-prejudice test for a general due process violation claim.

¶ 39                                  A. The Act

¶ 40    The Act provides a method for a defendant to collaterally attack a conviction by asserting it resulted from a "substantial denial" of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2022); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Generally, criminal defendants are entitled to file only one postconviction petition under the Act, which further specifies that any claims not raised in the original or amended petition are waived. 725 ILCS 5/122-3 (West 2022); *People v. Holman*, 191 Ill. 2d 204, 210 (2000). However, as relevant here, our supreme court has found that a criminal defendant may file a successive postconviction petition to prevent a fundamental miscarriage of justice. *People v. Ortiz*, 235 Ill. 2d 319, 329 (2009). As such, the bar against successive postconviction petitions will be lowered in two instances. First, a defendant may raise a

constitutional claim by satisfying the cause-and-prejudice test, which has been codified in the Act. 725 ILCS 5/122-1(f) (West 2022). Second, a defendant may assert a claim of actual innocence. *People v. Robinson*, 2020 IL 123849, ¶ 42. In either instance, a defendant must first obtain "leave of the court" before filing his petition. 725 ILCS 5/122-1(f) (West 2022). The standard for filing a successive petition "falls between the first-stage pleading requirement for an initial petition and the second-stage requirement of a substantial showing." *Robinson*, 2020 IL 123849, ¶ 58. At this stage, all well-pleaded allegations that are not positively rebutted by the record must be taken as true, and the court is precluded from making factual and credibility determinations. *Id.* ¶ 45. We review *de novo* the denial of a motion for leave to file a successive postconviction petition. *Id.* ¶ 39.

¶ 41                                B. Actual Innocence

¶ 42     Defendant first argues that the new evidence in his proposed petition makes a *prima facie* case of actual innocence and satisfies all elements for such a claim. He specifically contends that Harris, Cursey, and Smith's "profoundly weak" identifications are "destroyed" by the postconviction evidence included in his petition showing that Boudreau, Halloran, and O'Brien were engaged in a pattern and practice of misconduct to obtain false convictions, and Darryl's affidavit demonstrates defendant's innocence where Smith admits that his testimony was the result of coercion and Gladney saw Cursey running and shooting toward Thurman on the night in question.

¶ 43     "The conviction of an innocent person violates the due process clause of the Illinois Constitution." *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). To establish a claim of actual innocence, a defendant must show that the evidence in support of his or her claim is newly discovered, material and not merely cumulative, and of such a conclusive character that it would

probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). New evidence is that which was discovered after the trial and could not have been discovered earlier through the exercise of due diligence. *Id.* Material evidence is relevant and probative of the petitioner's innocence. *Id.* Noncumulative evidence is that which adds to what the factfinder heard at the trial. *Id.* Finally, conclusive means evidence, that when considered along with the trial evidence, would probably lead to a different result on retrial. *Id.* A request for leave to file should only be denied "where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Robinson*, 2020 IL 123849, ¶ 44. A colorable claim means that "the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Id.*

¶ 44    A petitioner is required to provide affidavits, records, or other evidence to show that the allegations in his petition are capable of objective or independent corroboration. *People v. Allen*, 2015 IL 113135, ¶ 26. An affidavit must be based upon the affiant's personal knowledge upon which he could competently testify at an evidentiary hearing. *People v. Brown*, 2014 IL App (1st) 122549, ¶ 56. The supporting evidence submitted with a petition "must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *People v. Delton*, 227 Ill. 2d 247, 254 (2008).

¶ 45    Preliminarily, we address and dispose of the State's argument that defendant's claims are not freestanding where he relies on the same evidence to support his actual innocence claim and his other constitutional claims in contravention of *People v. Hobley*, 182 Ill. 2d 404, 444 (1998) (holding that a freestanding claim of actual innocence exists only where the newly discovered evidence relied on is not also used to support a constitutional trial error claim). However, our

supreme court revisited this issue in *People v. Flournoy*, 2024 IL 129353. There, the supreme court held that, while "a petitioner can use the same evidence to plead both a 'free-standing' claim of actual innocence and a claim of constitutional trial error," ultimately "if the evidence establishes a claim of constitutional trial error, it will not establish a 'free-standing' claim of actual innocence." *Id.* ¶ 68. Thus, defendant may plead both claims supported by the same evidence at the leave-to-file stage.

¶ 46   We must also address the State's argument that portions of defendant's argument are forfeited. In particular, the State contends that defendant is now alleging, for the first time on appeal, that Harris and Cursey's identifications of defendant were coerced. See 725 ILCS 5/122-3 (West 2022) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived."). We disagree with the State that these "claims" are forfeited. Defendant has not attempted to supplement his petition upon appeal with any additional new evidence. He has also not presented any new claims, nor has he substantively altered the claims first presented below (*i.e.*, actual innocence and due process) in this appeal. Rather, defendant has merely pointed out issues with other trial evidence in this case and framed the issues regarding the identification evidence differently, *solely* in light of the newly discovered evidence included in his petition below, namely the detectives' pattern and practice of misconduct and Darryl's affidavit. See *Brunton v. Kruger*, 2015 IL 117663, ¶ 76 (parties are not required to limit their arguments on appeal to the same arguments made below); *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 87 (assertions in a *pro se* postconviction petition only need to bear some relationship to the arguments raised on appeal). Thus, we decline to find that any of defendant's claims or arguments have been forfeited.

¶ 47    In the instant case, defendant supports his actual innocence claim with the following documentation. Darryl's affidavit, which was obtained by an investigator in 2023, nearly a decade after it was executed, effectively states, albeit based on hearsay, that Smith was coerced by detectives into identifying defendant so that he "would not be charged with murder" and that Gladney observed Cursey shooting outside of E&J that evening. We note in passing that the affidavit does not provide any details as to the alleged coercion and does not clarify whether Gladney saw Cursey in addition to defendant or instead of defendant.

¶ 48    Defendant also submitted evidence of O'Brien, Halloran, and Boudreau's collective pattern and practice of abuse and misconduct from 1990 to 2001, as set out in the appellate record in *Anderson*. This included (but is not limited to) (1) a defendant's testimony that Boudreau had "told him the information to include in his inculpatory statement"; (2) an individual's testimony that Boudreau hit and choked him during an interrogation and that Boudreau and Halloran gave him a prepared statement to sign; (3) evidence that Boudreau and Halloran had been accused of misconduct by at least seven other individuals; (4) TIRC findings that O'Brien had been named in allegations of coercion approximately 50 times, with the allegations often involving physical abuse and abusive methods of detainment (*i.e.*, freezing cold rooms and denial of food, drink, and sleep) and some of these allegations involved all three detectives engaging in the misconduct; and (5) evidence that each detective had invoked the fifth amendment on at least one occasion when questioned about the misconduct allegations. Defendant also included a circuit court order entered in an unrelated case that collaterally estopped the State from contesting that these detectives engaged in a pattern and practice of misconduct. We note that, in the instant case, the State, as is appropriate, has not attempted to challenge the misconduct evidence but instead disputes only that the evidence supports defendant's claims in his petition.

¶ 49    We agree with defendant that all of this supporting documentation constitutes new, noncumulative, and material evidence. In particular, Darryl's affidavit contains information that was not presented to the jury at defendant's trial and is relevant to and probative of defendant's alleged innocence. Arguably, the information contained in Darryl's affidavit could have been discovered earlier as Smith and Gladney were both known witnesses and there is no explanation in the affidavit as to why they did not come forward with this information earlier. However, Smith allegedly informed Darryl that he was coerced into identifying defendant, rendering it unlikely that any amount of due diligence would have compelled Smith to provide this information prior to trial. See *People v. Harper*, 2013 IL App (1st) 102181, ¶ 42 (where testimony was obtained via threats from law enforcement, "due diligence could not have compelled [the witness] to testify truthfully at the first trial"). Regardless, Darryl, who was not a witness to the shooting and was not named at any point during defendant's trial, averred that his efforts to discover additional information were directed at proving Mason's innocence, not defendant's. Thus, it is not likely that defendant could have obtained this information from Darryl earlier. Additionally, the investigator assisting defendant did not discover the affidavit until 2023 and, although it is unclear when Darryl's conversation with Smith occurred, the conversation with Gladney took place after defendant filed his initial postconviction petition.

¶ 50    The pattern and practice of police misconduct evidence is also new, noncumulative, and material. This evidence is new because it could not have been discovered prior to defendant's trial, and the evidence is also noncumulative because no evidence of police misconduct was presented to the jury at defendant's trial. As to materiality, the State contends that this evidence does not satisfy that element because defendant failed to show that the detectives' misconduct in other cases is similar to what occurred in this case. The materiality element asks only whether the evidence is

relevant and probative of the petitioner's innocence. *Coleman*, 2013 IL 113307, ¶ 96. If the witnesses were coerced into identifying defendant, this evidence would certainly be relevant and probative of defendant's innocence. We do not believe that more needs to be shown for a *colorable* claim of actual innocence at this stage. See *People v. Almodovar*, 2013 IL App (1st) 101476, ¶ 68 (allegations that the detective influenced witnesses in another case was relevant to the detective's credibility and whether the witnesses in that case were similarly influenced).

¶ 51    Having determined that the evidence is newly discovered, noncumulative, and material, this leaves the question of whether the newly discovered evidence is of such conclusive character as to change the result on retrial. The conclusive element is the most significant for an actual innocence claim. *Robinson*, 2020 IL 123849, ¶ 47. The new evidence need not be completely dispositive to be likely to change the result on retrial. *Id.* ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result \*\*\*." *Id.* The ultimate question is whether the new evidence "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* At this stage, we must also be mindful that all well-pleaded facts not positively rebutted by the record must be taken as true. *People v. Childress*, 191 Ill. 2d 168, 174 (2000). As we explain below, the combined effect of the newly discovered evidence, when taken as true, satisfies the conclusive element to the extent necessary for a colorable actual innocence claim.

¶ 52    First, defendant's conviction in this case was based wholly on eyewitness testimony. There was no direct physical evidence tying defendant to the shooting. Although there was some evidence regarding the firearms used in the shooting, the gun used in the shooting was not found and the evidence that did place a certain type of gun in defendant's hand was also based on eyewitness testimony. That eyewitness testimony, however, is challenged by defendant's newly

discovered evidence where Gladney allegedly saw Cursey shooting outside the store, Smith's statements were allegedly coerced by the detectives, and the detectives in this case have an extensive history of procuring manipulated identifications and statements from witnesses and suspects. We note that "the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." *Robinson*, 2020 IL 123849, ¶ 60. To be positively rebutted, it must be "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* In this case, very little, if any, of the evidence presented at defendant's trial could be considered indisputable. Thus, the record does not affirmatively demonstrate that a trier of fact could never accept the newly discovered evidence as true.

¶ 53 Second, based on the evidence demonstrating the detectives' pattern and practice of misconduct, there is a generalized concern that the detectives may have coerced the identifications from all witnesses. Darryl's affidavit also expressly avers that Smith's identification of defendant was coerced. Although none of the newly discovered evidence expressly concerns the identifications made by Harris and Cursey, as defendant rightly points out, those identifications were hardly ironclad and were reasonably called into question by defense counsel at trial.

¶ 54 Next, taking Darryl's affidavit as true, as we must, Cursey's identification would be impeached by Gladney's alleged identification of him as a shooter. To this point, the State argues that Cursey could have been a third shooter, in addition to defendant, where Darryl's affidavit fails to affirmatively state that Gladney did not see defendant on the night of the shooting. We decline dismissal of defendant's claim on this basis. Even if Gladney named Cursey as a third shooter, in addition to defendant, that would certainly call into question all of the eyewitnesses' accounts of the incident and, thus, place the trial evidence in a different light. Regardless, we will not, at this

early stage, "speculate as to what a witness saw or did not see" where such facts are not indisputable. *People v. Harris*, 2024 IL 129753, ¶ 58.

¶ 55    Moreover, the detectives' credibility would be severely weakened, if not completely lacking, with the admission of the pattern and practice evidence. Because the evidence reveals innumerable allegations of abuse, manipulation, and coercion committed by Halloran, O'Brien, and Boudreau, it is reasonable to expect that a trier of fact would find O'Brien's testimony, as well as the entire investigation of this case, suspect. The detectives' testimony would also be impeached by their invocation of the fifth amendment. Notably, proceedings under the Act are civil in nature. *People v. Johnson*, 191 Ill. 2d 257, 270 (2000). When the privilege against self-incrimination is invoked in a civil proceeding, a court may consider the refusal to testify as evidence of the alleged misconduct where there is "some" evidence to support the allegations. *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 85 (citing *People v. Houar*, 365 Ill. App. 3d 682, 690 (2006)). The supporting evidence shows that all three detectives have invoked the fifth amendment in other cases of misconduct, and the negative inference to be drawn from that invocation would undermine each detective's credibility even further.

¶ 56    In opposition, the State contends that Darryl's affidavit cannot constitute conclusive evidence because it contains hearsay, Smith's recantation of his trial testimony is not reliable, and the new evidence only serves impeachment purposes, which is insufficient for an actual innocence claim. First, we note that hearsay may support a claim of actual innocence, as the rules of evidence do not apply to postconviction hearings. *Robinson*, 2020 IL 123849, ¶ 78. We also decline the State's invitation to find Smith's recantation as inherently unreliable. *Harper*, 2013 IL App (1st) 102181, ¶ 51 (reliability, or lack thereof, of recantation evidence should not be considered at this stage). Finally, we recognize that impeachment evidence will typically not be sufficient to satisfy

the conclusive element. See *id.* ¶ 49. However, it may justify postconviction relief where the newly discovered evidence is both exonerating and contradicts the State's evidence at trial. *Id.* As we have explained above, Darryl's affidavit is both potentially exonerating and contradicts the State's evidence at trial, and the pattern and practice evidence impeaches both the detectives' testimony, as well as the eyewitnesses' identification. Where the majority of the evidence of defendant's guilt is called into question, it certainly seems probable that the outcome at trial would be different. At this early stage, and in the interests of justice, we find that the prudent course is to reverse and remand for further proceedings on defendant's claim of actual innocence.

¶ 57                               C. Cause-and-Prejudice Test

¶ 58    Defendant next argues on appeal that the circuit court erred in finding that he failed to establish "prejudice" as to his alleged *Brady* claim and his general due process claim.

¶ 59    For this claim, defendant must demonstrate "cause for his *** failure to bring the claim in his *** initial post-conviction proceedings" and that "prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2022). "Cause" means "an objective factor that impeded [the defendant's] ability" to raise a claim, or to present a particular piece of evidence in support of a claim, in an earlier proceeding. *Id.* Our supreme court has explained that cause is present where "the factual or legal basis for a claim was not reasonably available to counsel" during the prior proceedings. (Internal quotation marks omitted.) *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002). "Prejudice" requires a showing that the alleged constitutional error "so infected the [defendant's] trial that the resulting conviction *** violated due process." 725 ILCS 5/122-1(f) (West 2022); *People v. Jackson*, 2021 IL 124818, ¶ 30. In other words, the defendant must show that the evidence, taken as true, is " 'conclusive' " in the sense that " 'it will probably change the result

upon retrial.' " *Jackson*, 2021 IL 124818, ¶ 31 (quoting *People v. Patterson*, 192 Ill. 2d 93, 139 (2000)).

¶ 60                                    1. *Brady* Claim

¶ 61    Defendant contends that his *Brady* claim merits advancement to second stage proceedings because the new evidence would have impeached the detectives and "cast this case in a totally different light" and "the prosecution failed to tell [defense counsel] about the officers' rampant misconduct."

¶ 62    The State does not contest that defendant has established cause based on this evidence, and although we need not, we nonetheless elect to explain why cause has been established. As our supreme court noted in *People v. Blalock*, 2022 IL 126682, ¶ 42, the majority of appellate court panels have concluded that newly discovered evidence of police misconduct may provide cause for the filing of a successive postconviction petition. In *Blalock*, the supreme court summarized the analysis of cause in *People v. Brandon*, 2021 IL App (1st) 172411, a case decided by the Third Division of the First District, and ultimately agreed with its conclusion. *Blalock*, 2022 IL 126682, ¶¶ 42-46. We necessarily find the holding in *Blalock* controlling.

¶ 63    Briefly, in *Brandon*, prior to trial, the defendant's motion to suppress based on police abuse was denied, and he did not raise that issue on direct appeal. *Brandon*, 2021 IL App (1st) 172411, ¶¶ 18, 25-26. The defendant filed his initial postconviction petition in 2001, which was summarily dismissed, and he filed his motion for leave to file a successive postconviction in 2010, alleging police abuse and including the 2006 report of the special state's attorney related the widespread torture of criminal suspects, which the circuit court denied. *Id.* ¶¶ 28-31. In 2017, the defendant filed a second successive postconviction petition, again alleging physical coercion by police. *Id.* ¶ 33. Attached to that petition were three affidavits of other alleged victims, a federal civil rights

complaint, and pre-2000 printouts of complaints against two officers. *Id.* ¶¶ 33-34. The circuit court denied the petition, finding that it was barred by *res judicata*. *Id.* ¶ 36. This court reversed and remanded, finding that cause was established. *Id.* ¶ 109. In doing so, the court stated:

> "It is through no fault of his own that a defendant does not have immediate access to evidence of a broader pattern of similar abuse inflicted on others by the accused officers. This evidence pertains to the conduct of the State's own agents, toward unknown individuals, during the investigation of other, usually unrelated, cases. The agents in question, the accused officers themselves, have every incentive to remain mum, if not to deny everything. And even the most diligent investigation of a defendant's own case will not reveal to him *who else* may have been abused by the same officers when they were interrogated in *their own* cases. (Emphases in original.)
>
> Uncovering that information is, of course, usually a herculean task for the defense. But the more important point is that this information generally has nothing to do with the facts of the defendant's own case. Thus, investigating the defendant's own case, as diligent counsel is required to do, will not uncover this information. [Citations.]
>
> In other words, the evidence a defendant needs to corroborate a claim of police abuse is as 'external to the defense' as it could possibly be, and the barriers to obtaining it are entirely 'objective'—that is, not of the defense's own making. [Citations.] So the defendant cannot be faulted for lacking this evidence at the start, and if it becomes available to him later, he may use it then in a successive petition." *Id.* ¶¶ 57-59.

¶ 64 Here, defendant submitted evidence of Detectives O'Brien, Halloran, and Boudreau's pattern and practice of misconduct through the appellate record in *Anderson*. As previously summarized, this included (1) a defendant's testimony that Boudreau had "told him the

information to include in his inculpatory statement"; (2) an individual's testimony that Boudreau hit and choked him during an interrogation and that Boudreau and Halloran gave him a prepared statement to sign; (3) evidence that Boudreau and Halloran had been accused of misconduct by at least seven other individuals; (4) TIRC findings that O'Brien had been named in allegations of coercion approximately 50 times, with the allegations often involving physical abuse and abusive methods of detainment (*i.e.*, freezing cold rooms and denial of food, drink, and sleep) and some of these allegations involved all three detectives in the instances of misconduct and abuse; and (5) evidence that each detective had invoked the fifth amendment on at least one occasion when questioned about the misconduct allegations. This collective evidence of misconduct and abuse was not known in 1999, at the time defendant filed his initial postconviction petition. See *Plummer*, 2021 IL App (1st) 200299, ¶ 95 (evidence was newly discovered where the reports investigating allegations of abuse by Detectives Kill and Boudreau did not exist until decades after the defendant's trial); *People v. Weathers*, 2015 IL App (1st) 133264, ¶ 36 (where the TIRC report related to the allegations of Detectives O'Brien and Halloran's abuse was created after the defendant filed his initial postconviction petition); *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 162 ("Although much of the alleged abuse occurred prior to [the] defendant's trial, we cannot say that [the] defendant would have discovered it through due diligence."). Accordingly, because defendant could not have discovered this evidence earlier, he has established cause based on this new evidence.

¶ 65   Although defendant has established cause based on this new evidence, as we explain below, he has failed to satisfy the prejudice prong for his *Brady*-based due process claim.

¶ 66   Under *Brady*, 373 U.S. 83, prosecutors are required to disclose exculpatory evidence to the defendant. To establish a *Brady* violation, a defendant must show that "(1) the undisclosed

evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). Because the prosecutor has a duty to learn of favorable evidence known to other government actors, including the police, the rule also encompasses evidence known only to police investigators. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).

¶ 67    However, our supreme court has held that the *Brady* rule does not require the State to disclose evidence of abusive practices based on the fact that the detectives themselves were aware of those practices. *People v. Orange*, 195 Ill. 2d 437 (2001). The supreme court in *Orange* held that the State was not required "to disclose information about misconduct in unrelated cases known only to individual police officers where the nexus between the other cases of alleged abuse and the defendant's case was not known until years after the defendant's trial." *Id.* at 458; see *Brandon*, 2021 IL App (1st) 172411, ¶¶ 79-81 (rejecting claim that the State violated *Brady* by failing to disclose a pattern and practice of physical abuse and coercion by the detectives who interrogated the defendant); *People v. Mitchell*, 2012 IL App (1st) 100907, ¶¶ 70-72 (under *Orange*, the State did not violate *Brady* by failing to disclose that a Burge subordinate battered suspects and committed perjury in other cases). As the Third Division of the First District of this court aptly explained, "[t]he *Kyles* principle, as our supreme court interpreted it, does not go so far as to impose on prosecutors an obligation to discover the abuse of one suspect and disclose that information to other defendants who were interrogated, and allegedly abused, by the same officers." *Brandon*, 2021 IL App (1st) 172411, ¶ 90.

¶ 68    In accordance with *Orange*, we must conclude that defendant's *Brady* claim cannot succeed. Defendant's claim is essentially the same as those in *Orange*, *Mitchell*, and *Brandon*, *i.e.*,

that the State failed to inform defendant's counsel "about the officers' rampant misconduct." In his reply brief, defendant contends, to no avail, that *Kyles* and *Orange* were wrongly decided. See *Gatreaux v. DKW Enterprises, LLC*, 2011 IL App (1st) 103482, ¶ 23 ("it is axiomatic that we are bound to follow the decisions of our supreme court and have no authority to overrule them"); see also *Brandon*, 2021 IL App (1st) 172411, ¶¶ 91-93 (recognizing that we are bound by the supreme court's holding in *Orange*). Therefore, defendant is unable to demonstrate prejudice for his *Brady* claim.

¶ 69                                    2. Due Process Claim

¶ 70    Finally, defendant claims that his petition presents a sufficient claim that the State violated his due process rights through its use of manipulated identifications of defendant at trial. In particular, he asserts that Harris, Smith, and Cursey's identifications fit the detectives' "classic pattern and become highly untrustworthy" and, thus, his conviction violates due process.

¶ 71    "[T]he use of false testimony underlying a conviction is a due process violation." *Washington*, 171 Ill. 2d at 487. This includes convictions based on inculpatory witness statements procured through police coercion or intimidation. *Jackson*, 2021 IL 124818, ¶ 29. Prior allegations of police misconduct are admissible where they involved the same officers, involved similar methods of abuse, and occurred around the same time that the defendant's allegations occurred. *People v. Reyes*, 369 Ill. App. 3d 1, 19 (2006). It is not required that the allegations be " 'strikingly similar.' " *Jackson*, 2021 IL 124818, ¶ 33 (quoting *Patterson*, 192 Ill. 2d at 145). Rather, "the critical inquiry is simply whether there is sufficient similarity between the misconduct at issue in the present case and the misconduct shown in other cases, such that it may fairly be said the officers were acting in conformity with a pattern and practice of behavior." *Id.* ¶ 34. This determination must be made on "the unique facts of each case." *Id.*

¶ 72 We have already concluded above that defendant's pattern and practice evidence satisfies the cause prong. That conclusion is equally applicable to this claim. Thus, we must now consider whether his due process claim satisfies the prejudice prong. As stated previously, the prejudice prong requires that the defendant show that the evidence, taken as true, is " 'conclusive' " in the sense that " 'it will probably change the result upon retrial.' " *Id.* ¶ 31 (quoting *Patterson*, 192 Ill. 2d at 139).

¶ 73 Here, it is clear that the evidence of police misconduct involved the same officers as in the case before us and such misconduct occurred around the same time as the investigation and trial in this case. We recognize the State's point that the record does not indicate which detectives were involved in which interviews or the extent of their involvement in those interviews and that defendant failed to include the police reports in his supporting documentation. For instance, Assistant State's Attorney Kirby indicated that Halloran was not in the room at all times while Kirby was taking Cursey's statement. Nonetheless, it is indisputable that O'Brien, Halloran, and Boudreau were involved in some capacity in the investigation of this case, including contact with most, if not all, of the testifying witnesses, and we find that sufficient at this stage.

¶ 74 The difficulty then is whether the allegations of coercion are sufficiently similar to the methods used in other cases of misconduct. In this case, we are faced with (1) Cursey's testimony that he was held at the police station for seemingly an extended period of time until he agreed to identify defendant and (2) Smith's generic allegation that the detectives coerced him into identifying defendant and his testimony at trial that he was considered a suspect and he was held in a "small room" until he agreed to testify before the grand jury. The submitted documentation indicates that O'Brien, Halloran, and Boudreau had been accused of providing individuals with prepared statements or instructing individuals on the information to include in a written statement.

The detectives had also been accused of various forms of physical abuse and abusive methods of detainment, such as extended periods of confinement in cold rooms or without food, drink, or sleep in order to procure false confessions or statements. The allegations of misconduct against these detectives numbered in the thirties, and the misconduct often related to the procurement of statements from witnesses and suspects. We acknowledge that details of the alleged coercion are slim in this case and that there is conflicting testimony that the statements identifying defendant were voluntarily made. However, construing the facts liberally in favor of defendant, as we must, we conclude that there is some evidence that undue influence, intimidation, or coercion may have been used to obtain at least one identification of defendant as the perpetrator, if not all three. Although the contours of this alleged coercion have yet to be filled in, further proceedings on this petition are appropriate in this case and will allow defendant to amend his petition with additional information.

¶ 75    For additional support, defendant relies on *People v. Martinez*, 2021 IL App (1st) 190490, *overruled in part by People v. Flournoy*, 2024 IL 129353.[3] In *Martinez*, the defendant asserted in his successive postconviction petition that his due process rights were violated by a detective's manipulation of evidence. *Martinez*, 2021 IL App (1st) 190490, ¶ 2. The defendant supported this claim with documentation providing numerous examples of situations in which the detective improperly influenced witnesses around the same time as the investigation of the defendant's case. *Id.* ¶ 63. The defendant also submitted an affidavit from an investigator who spoke with one of the trial witnesses, who insinuated that the detective had manipulated and coerced her into identifying the defendant in a lineup. *Id.* ¶ 49. The trial court dismissed the petition at the second stage, which

---

[3]The supreme court in *Flournoy* overruled *Martinez* to the extent that the court suggested that "the same evidence may establish both a 'free-standing' claim of actual innocence and a claim of constitutional trial error." *Flournoy*, 2024 IL 129353, ¶ 73.

requires a substantial showing of a constitutional violation. *Id.* ¶¶ 2, 57. On appeal, this court reversed and remanded for an evidentiary hearing. *Id.* ¶ 2. In coming to this conclusion, the court first noted that the detective in question had a "well-documented history of influencing and manipulating witnesses" and had invoked the fifth amendment, warranting an adverse inference. *Id.* ¶¶ 64, 72. When combined with the investigator's affidavit containing new witness statements, the court found that the defendant had "clearly presented evidence that [the detective] engaged in misconduct in [that] case" and had "made a substantial showing that his conviction rested on false evidence procured by police misconduct." *Id.* ¶¶ 76, 85.

¶ 76    Like in *Martinez*, the detectives here had a pattern and practice of manipulating witnesses and had invoked the fifth amendment in unrelated cases, and defendant submitted an affidavit suggesting that at least one of the witnesses' identifications was coerced. Although the record in *Martinez* showed a nexus between the alleged misconduct in defendant's case and the misconduct from the unrelated cases, which we do not have here, the second stage of postconviction proceedings requires a defendant to meet a higher bar than the one here. For that reason, we find *Martinez* sufficiently analogous and supports our conclusion that defendant has met the lower standard required at the first stage.

¶ 77    We additionally find *People v. Dixon*, 2021 IL App (1st) 161641, instructive. There, defendant, who was convicted of murder in 1985, filed a motion for leave to file a successive postconviction petition, alleging that two detectives improperly influenced a witness to falsely identify the defendant as the murderer. *Id.* ¶ 1. The defendant attached to his petition a report that documented the two detectives' participation in the physical and psychological abuse of witnesses and suspects from 1972 to 1991. *Id.* ¶ 8. In several cases involving those victims, the detectives refused to answer questions regarding that abuse on grounds that the answers would tend to

incriminate them. *Id.* The trial court denied the defendant's motion. *Id.* ¶ 9. This court reversed and remanded, concluding that the defendant had satisfied both prongs of the cause and prejudice test. *Id.* ¶ 16. As to cause, this court simply stated that the defendant could not have raised the claim earlier because the extent of the detectives' criminal activities did not come to light until after his trial and after the dismissal of his first postconviction petition. *Id.* ¶ 11. As to prejudice, the court stated that evidence that the detectives had abused numerous individuals to obtain wrongful convictions would have been relevant to excluding the identification testimony. *Id.* ¶ 13. The court noted that the witness in question had not testified that he was coerced into identifying the defendant, but nonetheless the proffered new evidence would have impeached the detectives' credibility and justified further proceedings to determine whether there was any undue influence. *Id.* ¶¶ 14-15.

¶ 78     Here, defendant has clearly satisfied the cause prong, and he has presented extensive evidence of the relevant detectives' pattern and practice of witness coercion. As in *Dixon*, this evidence would have been relevant at defendant's trial for the purpose of impeaching the detectives, destroying their credibility, and potentially excluding the witnesses' inculpatory identifications. The circumstances in the case before us, in fact, are stronger than those in *Dixon*. There, the record did not contain any suggestion that the detectives coerced the witness. Here, defendant has not only submitted an affidavit that states that Smith was coerced by the detectives to identify defendant, but there is also some indication in the trial record that the identifications of Smith and Cursey may not have been as voluntary as the State would lead us to believe. First of all, Cursey recanted his identification at trial. Second, Cursey testified that it felt like he had been at the police station in "a small room" for "weeks." Third, both Cursey and Smith stated that they were not allowed to leave the police station until they agreed to identify defendant before the grand

jury. Finally, the only remaining identification of defendant was described as "tentative" in O'Brien's report, and Harris stated that after the detectives went over the shooting "a thousand times," he was 98% sure that defendant was the shooter. This is sufficient to justify further proceedings to determine whether there was any coercion on behalf of the detectives.

¶ 79 Moreover, it is clear that the detectives' credibility and the reliability of the witnesses' identification of defendant was relevant and significant to his conviction, especially as that was the only inculpatory evidence. During closing argument, defense counsel suggested that the jury should question and scrutinize the identifications of defendant. In rebuttal, the State argued that there was no reason to question the credibility of the detectives and repeatedly suggested that the idea of the police framing defendant was untenable. Considering that is precisely what these detectives were doing in other cases around that time, this evidence would be highly relevant in assessing the credibility of the witnesses and the reliability of the identifications, which we have already noted were not free from doubt.

¶ 80 "[A] court must remember a petitioner is not required to conclusively establish 'cause and prejudice' before the trial court grants the petitioner leave to file his successive petition. Otherwise, a three-stage postconviction process would be 'superfluous.' " *People v. Canizalez-Cardena*, 2020 IL App (4th) 180212, ¶ 31 (citing *People v. Bailey*, 2017 IL 121450, ¶ 22). With this in mind, we conclude that the allegations in defendant's petition are sufficient to establish a *prima facie* case of cause and prejudice. See *Bailey*, 2017 IL 121450, ¶ 24.

¶ 81 In sum, although defendant's *Brady* claim is meritless, defendant has set forth a colorable claim of actual innocence and has satisfied the cause-and-prejudice test for his general due process violation claim. Accordingly, we reverse the circuit court's denial of defendant's leave-to-file

motion and remand for further proceedings on his successive postconviction petition as to those two claims only.

¶ 82                                    III. CONCLUSION

¶ 83    For the reasons stated, we affirm in part and reverse in part the judgment of the circuit court and remand for further proceedings.

¶ 84    Affirmed in part and reversed in part.

¶ 85    Cause remanded.

*People v. Johnson*, 2026 IL App (1st) 231497

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 94-CR-21182-01; the Hon. James M. Obbish, Judge, presiding. |
| **Attorneys for Appellant:** | Karl Leonard and Debra Loevy, of The Exoneration Project, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Paul E. Wojcicki, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |